**Michael Durwood GRIFFITH, Appellant,**

v.

**The STATE of Texas.**

**No. 72321.**

Court of Criminal Appeals of Texas, En Banc.

Dec. 16, 1998.

condition of bond under Art. 17.41). However, the specific provisions of Chapter 17 are not implicated in this case.

Michael B. Charlton, Houston, for appellant.

Dan McCrory, Assist. DA, Houston, Matthew Paul, State's Atty., Austin, for the State.

## OPINION

McCORMICK, P.J., delivered the opinion of the Court, in which MANSFIELD, KELLER, HOLLAND and WOMACK, JJ., joined.

Appellant was convicted in December 1995 of a capital murder committed in October 1994. V.T.C.A., Penal Code, Section 19.03(a)(2). Pursuant to the jury's answers to the statutory punishment issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial judge

sentenced appellant to death.[1] Article 37.071, Section 2(g). Direct appeal is automatic. Article 37.071, Section 2(h). We will affirm.

Appellant raises twelve points of error. He raises challenges to the sufficiency of the mitigation evidence. However, for the reasons put forth under those points, we need not set out a comprehensive recitation of the facts. Hence, only those facts necessary to address appellant's points will be included. Appellant's points will be addressed in the order in which he raises them on appeal.

■ Appellant advances in his first point of error that the trial court erred in failing to suppress the evidence seized from the hotel room following his arrest.[2] Specifically, appellant asserts not that his arrest was illegal, but that the State failed to carry its burden at the suppression hearing to show that it was lawful. Because of this, appellant contends that the evidence should be suppressed notwithstanding the fact that he signed a consent to search form.

The record reveals that several credit cards were stolen from the victim. Upon investigation, the police began to suspect appellant. Furthermore, outstanding warrants for other crimes not related to the capital murder charge already existed for appellant's arrest. In pursuing the investigation of the capital murder, officers were led to a Holiday Inn where a room had been secured by one of the stolen cards. The police knocked on the door of the room and appellant answered. According to officers' testimony at the suppression hearing, the police arrested appellant pursuant to the outstanding warrants and quickly conducted a protective search of the room. Within five minutes of entry, appellant was presented with a consent to search form which he signed.[3]

At the motion to suppress hearing, appellant admitted on cross-examination that he knew what the consent to search form was,[4] he signed it "knowingly and voluntarily," and he knew that he could have refused to sign it. Appellant further admitted that he knew a warrant was out for his arrest on an assault charge and that police officers "had a lawful right to arrest" him on that charge. Given this testimony, we hold that the trial judge acted within her discretion in overruling appellant's motion to suppress. *See Baker v. State*, 956 S.W.2d 19 (Tex.Cr.App.1997). Point of error one is overruled.

In his second point of error, appellant asserts that the trial court erred in "failing to provide funds with which to employ an expert witness." Specifically, appellant claims he was entitled to funds to hire a particular psychologist, Dr. Theodore Blau, to rebut the testimony of State's witness, psychologist Dr. Allan Brantley, of the Federal Bureau of Investigation's (FBI's) Behavioral Sciences Unit. To properly address this point of error, we must briefly set out the facts underlying the claim.

The record reflects that appellant filed a motion on November 1, 1995, requesting the appointment of psychiatrist Mitchell Young and psychologist Ed Friedman. The trial court granted this request, but limited the funds available to $6,000.00. According to Dr. Young's letter to defense counsel, psychologist David Hopkinson would also be helping with the case.[5] On November 22, 1995, appellant filed two additional motions requesting the appointment of "expert assistance." Each of these motions specifically asked for the appointment of psychologist Dr. Theodore Blau. Appellant urged his motion be granted because Blau was needed to respond to State's expert, FBI Special Agent Dr. Allan Brantley, who was going to use a

---

1. All references to articles are to those in the Texas Code of Criminal Procedure in effect at the time of the offense unless otherwise indicated.

2. This evidence included the murder weapon, credit cards taken from the victim, and credit card receipts.

3. According to officers' testimony, appellant was read his *Miranda* warnings prior to being given the consent to search form. However, appellant disputes this.

4. Appellant had been a peace officer for a number of years.

5. Appellant also filed a motion on November 1, 1995, requesting the appointment of a "psychosocial investigator." This request was also granted.

"threat assessment technique" (apparently similar to a future dangerousness analysis) and "compare the defendant to profiles of certain serial killers and discuss [appellant's] similarity to such individuals." Blau was apparently needed to show why such testimony was not "scientifically validated" and should, therefore, be held inadmissible. No affidavits or other evidence of need were included with the motion.

In considering the motion prior to trial, the trial judge asked appellant whether, if she granted his motion and appointed Blau, Blau was going to listen to Brantley's testimony. Appellant responded that he did not think so. The judge also asked appellant why one of the psychologists or the psychiatrist that had already been appointed could not rebut Brantley's testimony. Appellant responded that Brantley's testimony was not psychological in nature, but instead was based upon a forensic analysis. Appellant asserted that Blau was necessary because he was one of the people who developed the techniques about which Brantley would be testifying and he was the only non-FBI person counsel was aware of who utilized them. The judge overruled his request.

Prior to Brantley's testimony at punishment, the trial court held a hearing pursuant to Texas Rules of Criminal Evidence 702–705 to determine Brantley's qualifications and the bases for his testimony. Brantley told the judge that he was going to render an opinion on appellant's probability for being a future danger and that he was going to base that opinion upon crime scene photographs, investigative reports, interviews, autopsy photographs, school records, work records, and "everything that [he] could get [his] hands on." Brantley stated that he was not testifying from a psychological perspective *per se,* but rather from his experience in the criminal justice field. Brantley also told the judge that he did not intend to use the "profiling" technique of which appellant complained. Appellant challenged Brantley's testimony asserting that it was based on novel methodology and was cumulative because the State had established the same information through the cross-examination of appellant's experts. The judge held the testimony admissible. After Brantley's testimony, appellant re-urged his motion to be allowed to hire Dr. Blau. However, the judge also overruled this request.

In *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court explained that due process requires access to the raw materials integral to the building of an effective defense. *Id.* at 77, 105 S.Ct. 1087. In other words, the State must provide a defendant with the basic tools to present his defense within our adversarial system. *Id.* While the *Ake* case dealt with the appointment of a psychiatrist, it is now without question that *Ake* requires the appointment of an expert regardless of his field of expertise. *Rey v. State,* 897 S.W.2d 333, 338 (Tex.Cr.App.1995). As we set out in *Rey:*

"There is no principled way to distinguish between psychiatric and nonpsychiatric experts. The question in each case must be not what field of expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given." 897 S.W.2d at 338.

Hence, the nature of an expert's field and the importance and complexity of the issue will bear directly upon whether the appointment of an expert will be helpful. *Id.* The type of expert is also relevant to the determination of whether the trial was fundamentally unfair without the expert's assistance. *Id.*

However, this does not mean that the State must "purchase for an indigent defendant all the assistance that his wealthier counterparts might buy." *Ake, supra.* Nor does it mean that a defendant has a constitutional right to choose an expert of his personal liking. *Ake, supra; Cantu v. State,* 939 S.W.2d 627, 638–639 (Tex.Cr.App.1997). Rather, the purpose of the appointment is to level the playing field; to give a defendant access to a competent expert who can assist in the evaluation, preparation, and presentation of the defense. *See Rey,* 897 S.W.2d at 337.

In implementing this right to receive an expert, the burden is on the defendant to make a sufficient threshold showing

of the need for the expert's assistance. *Rey*, 897 S.W.2d at 339. In the instant case, it is not entirely clear exactly what type of expert appellant was seeking. The State's expert, Brantley, told the court that he was going to testify on the issue of appellant's future dangerousness, obviously a significant factor at trial. Furthermore, he specifically stated that he was not going to utilize the complained-of "profiling" technique, but instead was going to evaluate the evidence and make an assessment from that material. Whether from a psychological perspective or a criminal justice one, Brantley's actual testimony was akin to the testimony of a forensic psychologist.

Appellant asserted he needed Blau (a psychologist) to discount Brantley's testimony concerning the "profiling" technique because he had helped to develop the technique.[6] However, Brantley specifically indicated he was not going to utilize the technique. Even if Brantley had used the technique, it is unclear whether or not any of appellant's other experts were versed in the use of "profiling" and, therefore, could have rendered competent assistance. The fact that appellant requested a third psychologist and not some criminal justice or other forensic expert weighs against his being able to show need for this particular expert. Given the facts and the testimony presented, we cannot say that the trial judge was outside of the zone of reasonable disagreement in refusing to appoint Blau. *See Rey, supra.* Appellant's second point of error is overruled.

■ In point of error three, appellant posits that the trial court erred in allowing Brantley to testify "without first holding a Rule 702 hearing to determine whether Brantley's theories were sufficiently reliable to be admissible." In his fourth point, he contends that the trial court erred in admitting Brantley's testimony. The testimony at trial reveals the following exchange:

"THE COURT: Can I look at that; and then the other thing you want a hearing on—

"[DEFENSE COUNSEL:] Allen [sic] Brantley's qualifications to testify under rule 701, 702 and 705.

"THE COURT: Okay. We'll do that after we break.

\* \* \*

"So we'll play the tape, break, do the hearing and you can put on Brantley."

The record further shows, prior to Brantley's testimony before the jury, the judge did hear from both attorneys and Brantley concerning Brantley's qualifications to testify and the basis of his testimony. There is no indication in the record that appellant was prohibited from calling witnesses for this "hearing," nor did appellant make any complaint that this was not a sufficient hearing for purposes of qualifying the witness and establishing the basis of his testimony. Appellant's third point of error is not supported by the record and is, therefore, overruled.

■ With regard to point of error four, appellant claims that: 1) Brantley's testimony was based upon novel scientific theory and was, therefore, unreliable, and 2) the testimony was further not admissible because it did not assist the jury by providing any specialized knowledge. Appellant's allegations correspond with the trial court's task in assessing the admissibility of evidence under Rule 702. Pursuant to Rule 702, the trial court must determine whether the scientific evidence offered is sufficiently *reliable* and *relevant* to help the jury in reaching accurate results. *Hartman v. State*, 946 S.W.2d 60, 62 (Tex.Cr.App.1997).[7] The admission of such scientific evidence is within the sound discretion of the trial court and its decision regarding such will not be set aside absent an abuse of that discretion. *Clark v. State*, 881 S.W.2d 682, 698 (Tex.Cr.App.1994), *cert. denied*, 513 U.S. 1156, 115 S.Ct. 1114, 130 L.Ed.2d 1078 (1995).

■ To be considered reliable, evidence must have its basis in sound scientific methodology. *Id.* Evidence that is not reli-

---

6. Appellant also said he needed Blau to respond to Brantley's testimony. However, as stated previously, appellant told the judge that he did not think Blau was going to listen to that testimony.

7. Furthermore, it is not necessary that this evidence be *novel*. *Hartman, supra.*

able is not helpful to the jury because it frustrates rather then promotes intelligent evaluation of the facts. *Jordan v. State,* 928 S.W.2d 550, 554 (Tex.Cr.App.1996). With respect to the relevance consideration, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Jordan,* 928 S.W.2d at 555. Expert testimony that does not relate to a fact in issue is not helpful. *Id.*

The thrust of appellant's argument seems to concentrate on Brantley's use of the "profiling" technique. Appellant claims that this technique is not grounded in sound scientific theory and, therefore, should not have been admitted. However, during the hearing on Brantley's qualifications, the witness expressly stated that he would "not offer testimony about a profile." Because the witness did not offer the complained-of testimony, the majority of appellant's argument is moot. Alternatively, appellant argues that the witness's testimony was not relevant because it offered no expertise outside of the jury's own capabilities and it was cumulative "because [the prosecution has] established [the same information] by cross examination of the three psychologists [the defense] put on. All three said yes in free society he's dangerous."

In *Clark,* 881 S.W.2d at 698, we reaffirmed that psychological and psychiatric testimony is admissible during the punishment phase of a capital trial. However, the proponent of the evidence still has the burden to show that the witness possesses the requisite expertise required by Rule 702 and that the witness's testimony will assist the fact-finder. Appellant does not attack Brantley's qualifications as an "expert," therefore, the only remaining question is whether the trial judge could have reasonably determined that his testimony would be of benefit to the fact-finder.

■ An appellant's potential for being a future danger is a question of fact which the jury must answer. *See* Article 37.071, Section 2(b). Furthermore, this Court has previously recognized that testimony from mental health experts is relevant to that issue. *McBride v. State,* 862 S.W.2d 600, 608 (Tex. Cr.App.1993), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994).

■ In the instant case, Brantley testified that prior to becoming a special agent with the FBI, he had worked as a psychologist in a maximum security prison for about six years. Among other duties, Brantley stated that he was responsible for assessing and evaluating the adult male felon population for potential dangerousness or future threat to the community should they be released on parole. Brantley told the jury that he reviewed "hundreds" of such cases during his time in that position.

After leaving that post, Brantley became the senior psychologist and Mental Health Director for a three prison unit complex where he continued to perform future threat evaluations in addition to supervising other psychologists. Brantley further stated that he had taught "criminal psychology" at the FBI Academy for a number of years. Finally, Brantley told the jury that, before developing an opinion of appellant's future dangerousness in the instant case, he reviewed the investigative reports, crime scene photos, autopsy photos, witness statements, and appellant's school and personnel records, among other information.[8]

Given Brantley's specialized education and experience, and the effort he took to "fit" his evaluation to this particular case, we cannot say that the trial judge abused her discretion in determining that Brantley's testimony would be helpful to the jury.[9] *See Clark* and *McBride,* both *supra.* Point of error four is overruled.

■ In his fifth point of error, appellant complains that the trial court erred in allowing the victim's brother to testify at the punishment stage of trial about the impact

---

**8.** The record reveals that this was much the same material that appellant's experts reviewed before making their assessments.

**9.** Additionally, we have consistently defined "society" as encompassing both the prison population and the free population. *See Morris v. State,*

940 S.W.2d 610, 613 (Tex.Cr.App.1996). Although appellant's experts testified that appellant would be a danger to free society, the State was entitled to put on evidence that he would also be a danger in prison.

his sister's death in the instant offense had on their family. Specifically, the witness testified to the relationship the victim had with him and his family. He told the jury that his sister had been the planner and coordinator for all of the holidays the family celebrated. He also related how their father had been diagnosed with cancer before the victim's death, how the victim had helped to take care of him, and how their father quit fighting the disease after the victim was killed. Appellant did not cross-examine the witness.

The trial court did not abuse its discretion to admit this evidence under this Court's majority decision in *Mosley v. State*, 983 S.W.2d 249 (Tex.Cr.App.1998) (op. on reh'g). Point of error five is overruled.

■ Appellant complains in points of error six through nine about issues relating to the requirement that, if sentenced to life in prison, he must spend at least forty years in jail before becoming eligible for parole. *See* Article 42.18, Section 8(b)(2). Specifically, appellant asserts in his sixth point of error that the trial court erred in not submitting an instruction to the jury informing them that he would have to spend at least forty years in prison if sentenced to life. In his seventh point, appellant avers that he should have been allowed to voir dire the jury on this issue. And finally, in his eighth and ninth points of error, appellant complains that his expert witnesses should have been allowed to testify that appellant's threat of being a future danger would be substantially reduced given the required minimum incarceration time.

Appellant contends these issues are controlled by the United States Supreme Court case of *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). He concedes that this Court has already decided the issues against him. However, he "respectfully disagrees with this Court's reasoning" and urges us to consider his argument.

In *Smith v. State*, 898 S.W.2d 838 (Tex.Cr.App.1995)(plurality opinion), *cert. denied*, 516 U.S. 843, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995), this Court engaged in a comprehensive discussion of *Simmons* as it relates to the law in Texas. We reiterated that parole is traditionally not a matter for jury consideration in a Texas capital murder trial. And, thus, it is not error for a trial court to refuse to admit testimony concerning parole. *See Jones v. State*, 843 S.W.2d 487, 495 (Tex.Cr.App.1992), *cert. denied*, 507 U.S. 1035, 113 S.Ct. 1858, 123 L.Ed.2d 479 (1993). Further, we "absolutely reject[ed]" the premise that *Simmons* has been extended to parole eligible defendants. *Smith*, 898 S.W.2d at 848. As such, we hold that the requested instruction, voir dire, and testimony which is the subject of these points were appropriately refused by the trial court. *Smith, supra; Shannon v. State*, 942 S.W.2d 591, 594 (Tex.Cr.App.1996); *Broxton v. State*, 909 S.W.2d 912, 918–919 (Tex.Cr.App.1995). Points six through nine are overruled.

Appellant asserts in his tenth point of error that the evidence is insufficient to sustain the jury's negative finding to the mitigation issue. Similarly, in his eleventh point of error, he challenges the factual sufficiency of the mitigation evidence. Appellant notes his awareness that this Court has consistently refused to address such points. However, he advances that such review is mandated under due process.

■ We have previously held that the sufficiency of mitigation evidence is not reviewable by this Court. *Lawton v. State*, 913 S.W.2d 542, 557 (Tex.Cr.App.1995), *cert. denied*, 519 U.S. 826, 117 S.Ct. 88, 136 L.Ed.2d 44 (1996). We have also previously held that such a review is not constitutionally required. *McFarland v. State*, 928 S.W.2d 482, 499 (Tex.Cr.App.1996), *cert. denied*, 519 U.S. 1119, 117 S.Ct. 966, 136 L.Ed.2d 851 (1997). We decline to readdress the issue here. Points of error ten and eleven are overruled.

■ Appellant attests in his final point of error that the trial court erred in allowing the State to introduce evidence that two Harris County Sheriff's Office Supervisors who wrote positively of appellant were fired because of criminal convictions. During the punishment stage of trial, the State called Ruben Diaz to testify. Diaz, a lieutenant in the Harris County Sheriff's Department, told

the jury that he served as appellant's immediate supervisor at one point in time. As a result of this relationship, Diaz testified that he formed the opinion that appellant had a bad reputation.

While cross-examining Diaz, defense counsel introduced appellant's Harris County personnel file. Discussing the contents of this file with Diaz, defense counsel revealed to the jury several documents generated by appellant's past supervisors and colleagues chronicling his career as a peace officer. Among these were documents from deputies G. Poindexter and B. Mathis. Poindexter had conducted a check of appellant's references when appellant submitted an employment application to the Sheriff's Department and placed documents in appellant's file indicating that the people he had contacted spoke positively of appellant. Mathis had been one of appellant's superiors in the early 1980's and had given him several positive evaluations.[10]

On the State's redirect of Diaz, the prosecutor elicited testimony that Poindexter and Mathis had both been fired from the sheriff's department after being convicted of criminal offenses. It is this testimony of which appellant now complains.

■ The State responds that the complained-of statements were admissible under Tex.R.Crim.Evid. 806. Rule 806 states in pertinent part:

"When a hearsay statement, . . ., has been admitted in evidence, the credibility of the declarant may be attacked, . . ., by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, offered to impeach the declarant, is not subject to any requirement that he may have been afforded an opportunity to deny

or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine him on the statement as if under cross-examination."

While the State did not complain of the admission of appellant's personnel file and its contents, the trial judge could have reasonably concluded that the documents contained within the file were hearsay. In other words, the judge could have determined that the documents were statements, other than ones made by the declarant while testifying at trial, which had been offered in evidence to prove the truth of the matters asserted within. See Tex.R.Crim.Evid. 801(d).

Because we conclude the statements qualified as hearsay, the credibility of each declarant could then be attacked pursuant to the dictates of Rule 806. If the declarants had testified as witnesses, the State would have been allowed to impeach their credibility with a felony conviction or the conviction of a crime involving moral turpitude.[11] See Tex. R.Crim.Evid. 609(a). Hence, this same impeachment evidence could be used pursuant to Rule 806. Furthermore, the trial judge apparently engaged in the proper balancing test required under Rule 609(a) as evidenced by the fact that she made the State refrain from mentioning the specific crime of which each person was convicted. Given this, we cannot say that the trial judge abused her discretion in allowing the impeachment testimony. Point of error twelve is overruled.

Finding no reversible error, we affirm the conviction and sentence of the trial court.

MEYERS, J., filed a concurring opinion.

MANSFIELD, J., filed a concurring opinion.

KELLER, J., filed a concurring opinion joined by HOLLAND and WOMACK, JJ.

---

10. The file apparently revealed that at least nine of appellant's superiors had given him positive evaluations and commendations in the past.

11. Mathis' prior conviction was for the felony of rape. Although the record does not appear to set out what conviction was used to impeach Poindexter's credibility, appellant has not met his burden on appeal to show that the judge abused her discretionary authority in allowing the impeachment of Poindexter. In effect, appellant's entire argument is that "the trial court should not have admitted evidence of a conviction for someone who did not testify." Rule 806 expressly contradicts this assertion and appellant has failed to offer other relevant authority concerning his point of error. See Tex.R.App.Proc. 38.1(f)–(h) (formerly Tex.R.App.Proc. 74(f)).

BAIRD, J., filed a concurring and dissenting opinion joined by OVERSTREET and PRICE, JJ.

MEYERS, Judge, concurring.

The majority either assumes the trial court had the foresight to consider factors this Court would, more than two years later, recognize as important in assessing admissibility of victim related evidence at punishment in a capital murder case or undertakes the appropriate consideration of such factors itself in a kind of silent *de novo* review to which no one is privy. In either case, I decline to join them.

At the time of appellant's trial admissibility of victim related evidence at punishment was, at the very most, questionable.[1] *Mosley v. State*, 983 S.W.2d at 262 (Tex.Crim.App.1998)(recognizing "[o]ur jurisprudence in this area has been somewhat inconsistent and confusing"). A majority of the Court in *Mosley* rendered the issue no longer questionable, holding, "[b]oth victim impact and victim character evidence are admissible . . . ." Id. at 262. But the Court nevertheless placed admissibility within a specific context and purpose:

> "Both victim impact and victim character evidence are admissible, *in the context of the mitigation special issue, to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence.*"

*Id.*(emphasis added). Further, such evidence has no relevance to the issue on future dangerousness: "[s]uch evidence is patently irrelevant . . . to a determination of future dangerousness." *Id.* at 263. Trial courts were given considerable direction in assessing admissibility of victim related evidence under Rule 403:

> Rule 403 limits the admissibility of such evidence when the evidence predominantly encourages comparisons based upon the greater or lesser worth or morality of the victim. When the focus of the evidence shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society then the State exceeds the bounds of permissible testimony. We recognize that this standard does not draw a bright and easy line for determining when evidence concerning the victim is admissible and when it is not. Trial judges should exercise their sound discretion in permitting some evidence about the victim's character and the impact on others' lives while limiting the amount and scope of such testimony. Considerations in determining whether testimony should be excluded under Rule 403 should include the nature of the testimony, the relationship between the witness and the victim, the amount of testimony to be introduced, and the availability of other testimony relating to victim impact and character. And, mitigating evidence introduced by the defendant may also be considered in evaluating whether the State may subsequently offer victim-related testimony.

*Id.* at 262.

The trial court in the instant case ruled the evidence admissible without the benefit of the guidance offered by the majority in *Mosley*, over two years later. How can it be assumed the court took such factors into account? The majority dismisses appellant's complaint about the admissibility of the victim related evidence, stating only "[t]he trial court did not abuse its discretion to admit this evidence under this Court's majority decision in *Mosley*." *Majority opinion* at 289. There is no indication from the majority's opinion whether the admissibility of the victim related evidence was evaluated, by the trial court or by this Court, according to the considerations set out by the majority in *Mosley*. Perhaps it is the defendant's burden to request such analysis.[2] The majority

---

1. Appellant argued the evidence would "violate rules 401 through 404 B of the Texas Rules of Evidence" and also contended "its probative value is greatly outweighed by its prejudicial impact."

2. This may be like a Rule 403 context. The party opposing admissibility of otherwise relevant evidence must make an objection under Rule 403 in order for the trial court to weigh its probative value against its prejudicial effect. *See Santellan v. State*, 939 S.W.2d 155, 169 (Tex.Crim.App.

does not say. It may be that the only binding value to the Court's opinion in *Mosley* is its bottom line holding. Other pearls of wisdom offered the bench and bar in that case are non-binding dicta which needn't be bothered with. I refuse to join the majority's so-called application of *Mosley*.

After reviewing the record, absent a waiver of the mitigation issue by appellant, and considering factors discussed in *Mosley* which bear on admissibility under Rule 403, I would at least agree the victim's brother's testimony was harmless beyond a reasonable doubt as to the issue of future dangerousness[3] and to the mitigation issue.[4]

With these comments, I concur in the judgment of the Court.

MANSFIELD, J., delivered the *concurring opinion.*

I agree with the majority that the trial court did not abuse its discretion in not providing appellant with the funds to retain an expert, psychologist Theodore Blau. However, for the reasons stated herein, I believe, assuming, arguendo, that if it did err, the error was clearly harmless under Texas Rule

of Appellate Procedure 44.2 or under its predecessor, Rule 81(b)(2).

In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the Supreme Court held an indigent defendant has a due process right to state-funded expert assistance where the defendant makes a preliminary showing the issue for which he seeks said expert assistance is likely to be a significant factor at trial.[1] In *Ake*, unlike the present case, the defendant was not provided with *any* expert assistance on either the issue of insanity (there was considerable evidence he may well have been insane) or on the issue of future dangerousness (the only evidence of future dangerousness presented at the punishment phase was the unrebutted testimony from the guilt phase of the State's psychiatric witness).

The present case could hardly be more dissimilar to *Ake*. First, the State presented considerable non-psychiatric evidence at the punishment phase, including graphic testimony as to appellant's propensity for violent behavior. This evidence included the following:

(a) evidence appellant was fired in January of 1993 from his position as a Harris

---

1997)(once trial judge has ruled on relevance beyond character conformity value and on opponent's Rule 404(b) objection, opponent then required to make objection under Rule 403 in order for trial judge to weigh probative and prejudicial values).

3. The jury charge instructed the jury to consider the victim related evidence when deliberating on the issue of future danger:

In deliberating on Special Issue No. 1 you shall consider all the evidence admitted at the guilt or innocence stage and at the punishment stage of trial, including evidence of the defendant's background or character or the circumstances of the offense that militate for or mitigate against the imposition of the death penalty.

*Mosley* held victim related evidence militates for imposition of the death penalty, and that such evidence is not relevant to the issue of future danger.

4. As this is a lone, concurring opinion, there is little value in belaboring the bench and bar with my analysis.

My analysis went only so far as appellant's brief suggested it should. That is, I did not address other issues that could have been, but

were not, raised under *Mosley*. For instance, defendants are now entitled to waive altogether "submission and reliance" on the mitigation special issue and thereby avoid the State's admission of victim related evidence. *Mosley*, slip op. at 263–264. At the time of appellant's trial, the law suggested special issues could not be waived. *Powell v. State*, 897 S.W.2d 307, 314–18 (Tex.Crim.App.1994)(plurality opinion); *id.* at 318 (Clinton, J., concurring)(holding "deliberateness" issue could not be waived, even affirmatively, by defendant). *Mosley* distinguished that law, holding it inapplicable to the mitigation issue. We have no way of now knowing what choice appellant would have made had he been aware of this option at the time of his punishment hearing. Appellant does not now complain that he was not afforded this option, however.

1. In *Ake*, a capital case, the State put on psychiatric testimony at the guilt/innocence phase that Ake would be a future danger to society. Ake's defense was insanity, and he was denied state funds to hire psychiatric assistance to rebut the State's psychiatric evidence. At the punishment phase, no new evidence was presented, and Ake had no expert to testify either as to future dangerousness or to mitigation.

County deputy sheriff after he was convicted of assaulting his ex-wife and girlfriend.

(b) testimony of Cheryl Stanley, married to appellant from 1971 to 1981, describing several assaults made by appellant against her and their daughter. One of the assaults resulted in several of Stanley's ribs being broken and another involved appellant holding a gun to her head.

(c) Lola Atkinson, who married appellant in 1989, testified as to appellant's violent temper and described instances when he pulled a gun on her and broke furniture. She testified that after they separated, he broke down the door, stole her money, and broke the windows in her car. She testified she reported the last incident to the Sheriff's Department.

(d) Brenda Lockridge, who started dating appellant in October 1992, testified appellant had a bad temper and, on one occasion, choked her and pulled a gun on her. Then, three weeks later, he went into a rage, destroyed items in his apartment, held her hostage and threatened to kill her with a pair of scissors. Lockridge testified, after twelve hours, she escaped and called the police. This incident led to appellant's arrest and conviction for assault.

(e) Hilda Garcia testified she met appellant in 1993 and moved in with him in March 1994. On one occasion she said he slapped her and chipped her tooth. On another occasion he destroyed some of her property and hit her in the breasts.

(f) Karen James, a teller at Guardian Savings and Loan, testified appellant entered the bank on October 14, 1994, pulled a gun and demanded money. After she gave him the money he shot her twice in the head.

(g) Loan Khuu testified appellant, on October 28, 1994, entered the bridal salon where she worked, pulled a gun and demanded all the money. After she gave him the money, appellant forced her into a back room and forced her at gunpoint and knife point to perform oral sex on him. He tied her up and left.

Appellant presented evidence at the punishment hearing including testimony from Cheryl Stanley and several police officers, all of whom testified he was a good police officer and was very devoted to his job. Appellant also presented the testimony of two psychologists, Freichman and Hopkinson, and a psychiatrist, Young. These three experts testified appellant suffered from a borderline personality disorder. They testified appellant was unable to control his anger but the structure he had in his life while a police officer "held him together." Dr. Young opined the structure provided by prison life would likely prevent him from committing future acts of violence, especially if appellant had no contact with women. The complainant in the instant case is a woman.[2]

The State then presented the testimony of FBI agent Brantley. Before joining the FBI, Brantley was employed as a psychologist by a maximum security prison where he evaluated the future dangerousness of the inmate population. Brantley testified he studied the crime scene, autopsy photographs, the offense report and appellant's school and work records. He also interviewed Karen James, Loan Khuu and one of the appellant's girlfriends and visited the crime scene. He did not interview appellant. Based on his review of the case, Brantley opined appellant posed a future danger to society. He opined further that appellant, if confined, would likely prey on weaker male inmates.

The defendant in *Ake* was provided with no expert assistance at the punishment phase; the only evidence presented on the issue of future dangerousness was testimony at the guilt phase by State experts that, in their opinion, Ake would be a future danger. Ake's indigency rendered him unable to present evidence favorable to him on the key issue of future dangerousness, clearly a violation of his federal constitutional right to due process.

In the present case, appellant was provided three expert witnesses, all of whom testified on his behalf at punishment. There was considerable expert testimony appellant would not be a future danger if confined in

2. Appellant stabbed the complainant to death while in the course of committing robbery. There was also evidence appellant had sexually assaulted her.

the environment of the penitentiary. Even if one assumes, *arguendo*, appellant should have been provided funds to retain Dr. Blau as an expert witness so as to potentially rebut Brantley's testimony,[3] in light of the extensive expert assistance he was provided, the failure of the court to do so, in my opinion, would not be error of a magnitude requiring reversal, assuming it was error at all.

Furthermore, several witnesses testified as to the commission of many violent acts committed against women by appellant over a more than twenty-year period of time. These acts included violent assaults resulting in significant injuries, destruction of property, aggravated robberies, aggravated sexual assaults and attempted murder. These acts show appellant has been dangerous to society for many years and a rational jury could conclude he would continue to be so in the future. The facts of the instant offense, a vicious capital murder by stabbing with evidence of aggravated sexual assault, are evidence of appellant's dangerousness. Under the standards set forth by this Court in *Keeton v. State*, 724 S.W.2d 58, 61 (Tex.Crim. App.1987) and *Clewis v. State*, 922 S.W.2d 126 (Tex.Crim.App.1996), the evidence is more than factually sufficient to support the jury's affirmative answer to the future dangerousness special issue. Indeed, it is hard to imagine *any* rational jury, given this evidence, could find appellant would not be a future danger to society.

In light of all the evidence presented at the punishment phase, it is my opinion that the failure of the trial court, if one assumes this was error, to provide funds to retain Dr. Blau did not have a significant influence on the jury's affirmative answer as to the first special issue. It is also my opinion that, even if *one* assumes this failure was error of a constitutional dimension, any such error did not contribute, beyond a reasonable doubt, to the jury's punishment verdict. *See* Tex. R.App. Proc. 44.2(a) and 44.2(b). *See also, Kotteakos v. U.S.*, 328 U.S. 750, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946); *King v.*

*State*, 953 S.W.2d 266, 271 (Tex.Crim.App. 1997).

Because I agree the trial court did not err in failing to provide appellant with funds to retain Theodore Blau, I join the opinion of the Court.

KELLER, Judge, concurring.

I join the majority opinion. Even if one assumed arguendo, however, that appellant adequately presented his claim during the hearing held on the motion to appoint an expert, I would hold that appellant has failed to show that he was deprived of due process as a result of the trial court's refusal to hire Dr. Theodore Blau as a defense expert at state expense.

I.

In his motion for expert assistance, appellant contended that the State intended to call Dr. Alan Brantley for the purpose of using a forensic profiling technique to show that appellant posed a future danger to society. Appellant claimed that he needed Blau's testimony to show that the technique was not scientifically valid and was not intended for use outside of the investigatory context. Appellant explained that Blau had helped the FBI develop the technique in question and was therefore in a unique position to give relevant testimony concerning its reliability. In a supplemental motion appellant also contended that he needed Blau's assistance to help defense counsel prepare for cross-examination and to provide direct testimony.

At the hearing on appellant's motions, the trial court asked if Blau was going to listen to Brantley's testimony. Defense counsel replied, "I don't think so" and stated that he could take notes and give them to Blau. The trial court then asked why appellant's psychiatrist and psychologist could not rebut Brantley's testimony. A psychiatrist, Dr. Mitchell Young, and two psychologists, Edward Friechman and David Hopkinson, had been retained on appellant's behalf. As the

---

**3.** Appellant contends Brantley's testimony was based largely on a technique known as "profiling," and only Blau was equipped, by training and experience, to cast doubt as to the validity of

profiling. A review of the record, however, supports the State's contention that Brantley's opinion was, at most, tangentially affected by profiling.

majority points out, defense counsel contended that these experts could not provide the desired testimony because Brantley's testimony was forensic in nature rather than psychological.

Before Brantley testified, appellant objected to Brantley's testimony, characterizing it as "novel." The State contended that the evidence was not novel, but merely involved the opinions of a psychologist based upon experience and training in dealing with violent offenders. Appellant contended that the testimony was novel because the witness relied upon methodology.

Responding to appellant's concerns, Brantley denied that he would rely upon profiling techniques. Brantley explained that profiling involved forming a behavior composite for an unknown offender and that the technique was inapplicable where the offender was known. Brantley stated that he would rely primarily upon appellant's past behavior as a predictor of his future dangerousness.

During his testimony, Brantley expressed an opinion, based upon his training and experience and his consideration of a variety of factors, that appellant posed a future danger:

Q. Based upon your education and your background and experience and specialized training you formed an opinion as to the—based upon the Debra McCormick case, Karen James case, the Loan Khuu case, have you formed an opinion whether—an opinion regarding the future probabilities of dangerousness of this particular defendant?

A. Yes I have.

Q. What is your opinion about the likelihood or the probability of him continuing to be a violent person?

A. Well, in my opinion based upon the totality of everything that I had access to and everything I reviewed and all the people I talked to it's my opinion that the probability of the offender here, Mr. Griffith, engaging in future acts of violence consistent with his past behavior is quite high.

In reaching his conclusion, Brantley relied not only upon forensic evidence (the crime scene, autopsy) but also upon a variety of other kinds of evidence, including witness interviews, personnel records, school records, investigative reports, and an interview with a former girlfriend. Brantley never claimed, during his testimony before the jury, that his assessment of appellant's future dangerousness was based upon a scientific technique or a particular methodology.

Later, appellant filed a bill of exceptions, providing a description of the testimony Blau would have provided at trial:

Dr. Blau assisted the Behavioral Sciences Unit of the FBI in developing its offender profile. The process or technique was not developed to assist prosecutors in the prediction of dangerousness for known criminals but to study unsolved crimes in order to provide the behavioral and personality characteristics of unidentified offenders. The process involves an analysis of the nature of the offense and the manner in which it was committed. The data are compared with characteristics of known personality types, from which a description of the offender is developed. This profiling is most productive where the same offender demonstrates repeated patterns of the same crime. The purpose of profiling is to catch a criminal, not predict future dangerousness. Very few efforts have been made to validate the quality of the psychological profiles. At its present stage of development, it is more of an art form than a science, relying, as it does, heavily on intuition, rather than quantifiable measurement. While it is useful, it is a difficult and unreliable procedure. In terms of detecting and locating the offender, it has been successful in approximately 45% of the cases and of some assistance in 70% of the cases.[1]

## II.

We have held that, to be entitled to a state-appointed expert, a defendant must show that the proffered expertise relates to

---

1. The bill of exceptions also stated that Blau would testify regarding the general inability of mental health experts to predict future dangerousness. Appellant does not discuss this portion of the bill in his brief and makes no claim based upon it.

an issue that is "likely to be a significant factor" at trial. *Rey v. State*, 897 S.W.2d 333, 339 (Tex.Crim.App.1995)(citing and quoting *Ake v. Oklahoma*, 470 U.S. 68, 74, 82–83, 86, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)). The "likely to be a significant factor" language necessarily inquires about the showing made to the trial court by a defendant before trial. An important question, though, is whether *Ake* confers due process protection upon a defendant when the events at trial show that he did not in fact need the proffered expertise even though, at an earlier point in time, such expertise may have appeared to be necessary. I would answer that question "no."

In *Ake*, as in many other cases, the Supreme Court recognized that due process is grounded on the notion of "fundamental fairness." 470 U.S. at 76, 105 S.Ct. 1087. Fundamental fairness requires that a defendant have a "meaningful access to justice." *Id.* at 77, 105 S.Ct. 1087. A defendant who did not need the expert witness has not been deprived of a meaningful access to justice and hence, has not been deprived of due process. In evaluating the due process claim in *Ake*, the Supreme Court did not limit its analysis to the events preceding the defendant's request for expert assistance but considered subsequent events transpiring at trial. *See Id.* at 86–87, 105 S.Ct. 1087. Moreover, a majority of this Court has characterized *Ake* error as "structural," and therefore, not subject to a harm analysis. We found this type of error to be structural because it is "one which eliminates a basic tool of an adequate defense." *Rey*, 897 S.W.2d at 345. But refusing to appoint an expert does not in fact eliminate a basic tool of an adequate defense if the defendant did not in fact need the expert. And the defendant has not established his deprivation of an adequate defense when the stated purpose for which the expert was sought is shown to be irrelevant in light of events occurring at trial.

### III.

Appellant claims that he needed to hire Blau for two reasons: (1) to provide testimony relating to the theory of forensic profiling, and (2) to assist defense counsel in cross-examining Brantley. Neither of these reasons is implicated in the case at hand.

Reason (1) is not implicated because Brantley provided no testimony concerning the profiling technique. That technique relies solely upon forensic evidence to extrapolate the characteristics of an unknown offender. But Brantley did not rely solely upon forensic evidence and he did not attempt to extrapolate the characteristics of an unknown offender. In reaching his conclusions Brantley relied not only upon forensic evidence but also upon many nonforensic sources, and those sources (e.g. witnesses, girlfriend, and school and personnel records) were familiar with appellant. Moreover, Brantley did not claim to rely upon any scientific technique or methodology (the alleged basis for claiming that his testimony was "novel"). Instead, he relied upon his training and extensive experience in the area of criminal psychology to formulate his opinions. Hence, testimony from Blau concerning the inapplicability of the technique would have been irrelevant because Brantley did not rely upon the technique. Instead, Brantley formed an opinion based upon a holistic review of the evidence relating to appellant, and Brantley evaluated that evidence by using his training and experience.

Even though Brantley was an expert in the profiling technique, he did not testify about that technique during this trial. At the hearing on the admissibility of Brantley's testimony, the trial court commented, "I don't think there's anything *novel* about it." The court was correct.

As for reason (2), assistance with cross-examination, appellant has failed to show that he needed or could have benefitted from such assistance. Because Brantley relied upon his training and experience rather than upon the profiling technique or any specific methodology, Blau's expertise regarding the technique would not have assisted defense counsel during cross-examination. Moreover, given the nature of the future dangerousness issue, and the nature of Brantley's testimony, it would appear unlikely that any expert assistance would increase the effectiveness of cross-examination. Another expert might, based upon his own training and

experience, disagree with Brantley's conclusions, but such disagreement, while useful as testimony, would not provide any basis for cross-examination.

Because appellant has not shown that Blau was needed for any relevant purpose during the trial, appellant's due process claim must fail. With these comments, I join the majority opinion.

HOLLAND and WOMACK, JJ., join.

BAIRD, Judge, concurring and dissenting.

I agree there was no error at the guilt phase of appellant's trial. Accordingly, I concur in the decision to affirm the conviction. However, the trial judge erred, at the punishment phase, in denying appellant's request for funds to employ an expert witness to assist appellant in challenging and cross-examining the State's punishment expert. Accordingly, I would sustain the second point of error, reverse the judgment of the trial court and remand for a new punishment hearing. Because the majority does not, I dissent.

**I.**

Dr. Allen Brantley worked for the Behavioral Sciences Unit of the Federal Bureau of Investigation (FBI) and was hired by the State to testify at the punishment phase of trial that appellant would constitute a future danger to society. Specifically, the State intended to use Brantley to perform what he termed a "threat analysis" or "threat assessment technique" which would "compare the defendant to profiles of certain serial killers and discuss [appellant's] similarity to such individuals." The intended purpose of this technique was to help law enforcement identify *unknown* offenders through a system of profiling.[1]

Appellant filed two motions requesting funds to employ Dr. Theodore Blau, a psychologist. Attached to the first motion was a

copy of Brantley's testimony in another capital murder case. The testimony was provided to show the trial judge why Blau was necessary to assist in understanding and rebutting Brantley's methodology. The second motion provided the trial judge with a copy of Blau's resume and his fee agreement.

At the hearing on these motions, the judge asked defense counsel why the two psychologists already retained by appellant, Dr. Young and Dr. Freedman, could not provide the assistance appellant needed to rebut Brantley. Defense counsel explained that books written by former FBI analysts said the *threat analysis technique was primarily forensic and not psychological.* In fact, it is undisputed the technique was developed as an investigative tool to assist police with identification of suspects when the actual identity of an offender was *unknown,* and as a predictor of what suspects might do next in the context of serial crimes.

Moreover, Young and Freedman were retained to evaluate appellant for two isolated and very specific psychological problems. Young, who had significant experience evaluating and treating men who abuse their spouses, as well as experience working in the Institutional Division of the Texas Department of Criminal Justice, was appointed, at appellant's request, specifically to "... test and evaluate the [d]efendant with a view to explaining the etiology of [d]efendant's abuse of women." Likewise, because appellant's life seemed to "unravel" after he was suspended from the police force, Freedman, who specializes in evaluations of police officers, "especially those whose lives deteriorate after separation from law enforcement," was appointed at appellant's request to evaluate the psychological impact of appellant's suspension from the police force. Since the Court appointed Young and Freedman *because* the scope of their expertise was narrow and specific to appellant's problems, and because Brantley was hired by the State to

**1.** Brantley testified he did not intend to "profile" appellant, but rather intended to "assess" appellant. However, Brantley admitted his methodology for this "assessment" did not involve any psychological interviews of appellant. Rather, Brantley stated he intended to testify "the probability of Mr. Griffith committing future acts of

violence consistent with his past history is high" based on "the crime scene, crime scene photos, investigative reports, interviewing with surviving witnesses, former girlfriend, looked at all protocol, autopsy records, everything I could get my hands on is what I looked at."

testify on a technique that was forensic and not psychological in nature, it is clear neither Young, nor Freedman, were in a position to assist appellant in rebutting Brantley's testimony.

Furthermore, appellant made a strong showing in both of his motions and at the hearing on these motions that Blau could prove Brantley's "threat analysis" or "threat assessment technique" was not scientifically validated and had never been subjected to peer review on the question of reliability. Critically, appellant established that Blau was in a unique position to provide this information because *he helped the FBI develop the threat analysis technique for its intended function and could provide valuable insight into the methodology.* Appellant insisted that if appointed, Blau would provide the court with proof that Brantley's testimony is inadmissible and "... that no federal court has ever accepted or admitted the testimony of Dr. Brantley and his colleagues." Further, *"[h]e will also testify that no scientific study that has ever analyzed this threat assessment technique has ever found it reliable. He will set forth in detail why this technique is not scientifically validated and therefore, not reliable."* Additionally, appellant told the judge that, as a practical matter, Blau's "assistance is necessary because he can access and provide copies of all of the scientific studies that have examined this issue."

Even though appellant believed Blau would convince the judge that Brantley's testimony was inadmissible, he argued that, in the event Brantley's testimony was admitted, given the complex nature of the technique, the defense will need the expert assistance of Blau to effectively cross-examine Brantley as well as to testify as to the methodology of the technique. The motions to appoint Blau were denied.

Brantley testified for the State at the punishment phase at which time appellant objected again to Brantley's methodology as novel and not scientifically validated, unreliable, not relevant because it is repetitive of evidence already before the jury, not capable of assisting the jury, and consequently inadmissible. These objections were overruled.

Appellant also filed a written bill of exceptions detailing what Blau would have testified to and how he would have helped appellant challenge and cross-examine Brantley's testimony.

## II.

In *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), the United States Supreme Court held that due process entitles an indigent defendant to the appointment of a competent expert who can assist in the evaluation, preparation, and presentation of the defense when the defendant makes a preliminary showing that the issue for which he seeks expert assistance is "likely to be a significant factor at trial." *Williams v. State*, 958 S.W.2d 186, 192 (Tex.Cr.App.1997); *Rey v. State*, 897 S.W.2d 333, 339 (Tex.Cr. App.1995); *and, DeFreece v. State*, 848 S.W.2d 150 (Tex.Cr.App.1993). This holding is premised upon the notion that an indigent is entitled to "meaningful access to justice" which means he should have "access to the raw materials integral to the building of an effective defense" thus ensuring "a proper functioning of the adversary process." *Williams*, 958 S.W.2d at 192. The Supreme Court explained while "... the court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to 'an adequate opportunity to present their claims fairly within the adversary system,' and we have required that such tools be provided to those defendants who cannot afford to pay for them." *Ake*, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093, 84 L.Ed.2d 53 (1985).

The *Ake* Court held because the State had a psychiatrist to testify as to Ake's future dangerousness, the trial judge erred in denying Ake the means of presenting evidence to rebut the State's expert by not appointing Ake a psychiatrist. In *Williams*, we stated that "[w]hile the *Ake* case dealt with the appointment of a psychiatrist, it is now without question that *Ake* requires the appointment of an expert regardless of his field of expertise." 958 S.W.2d at 192. *See also, Rey*, 897 S.W.2d at 338.

Similarly, Brantley was offered by the State as an expert who would allegedly provide "scientific" analysis of appellant's future dangerousness. What makes appellant's case even more compelling than *Ake* is the fact that the State's expert planned to establish appellant's future dangerousness not on accepted psychiatric testimony, but on a novel technique, developed for a different purpose than its intended use in appellant's case. We explained in *Rey*:

> There is no principled way to distinguish between psychiatric and non-psychiatric experts. The question in each case must be not what field of expert knowledge is involved, but rather how important the scientific issue is in the case, and how much help a defense expert could have given.

897 S.W.2d at 338 (*citing Little v. Armontrout*, 835 F.2d 1240, 1243 (8th Cir.1987), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 894 (1988)). Thus, the decision whether the appointment of an expert would be helpful, or whether the trial was fundamentally unfair without the expert's assistance is dependant on the nature of an expert's field *and the importance and complexity of the issue. Williams*, 958 S.W.2d at 192; *and, Rey*, 897 S.W.2d at 338.

In this light, it is clear the trial judge should have granted appellant's *Ake* motions. First, it does not matter that Blau was not a psychiatrist because, as explained *supra, Ake* has been interpreted to require the appointment of an expert regardless of his field of expertise. *Rey*, 897 S.W.2d at 338. Second, in regard to the criteria explained in *Rey*, it is unquestionable the issue of future dangerousness is of utmost *importance* during the punishment phase of a capital murder trial, and thus an issue deserving of expert assistance.[2] The third factor, which appellant documented well, was the *complexity* of the issue for which he needed expert assistance. Indeed, appellant explained he needed Blau specifically, because he, along with Brantley, developed the very technique at issue and could prove Brantley's testimony was not scientifically validated, had never been subject to peer review as to reliability, that no study reviewing the technique has ever found it to be reliable, that it was created for a purpose not the same as its intended use in the present case, and, that it had never been relied on, or even admitted in federal court.

---

**2.** Precedent recognizes the importance of expert testimony on the issue of future dangerousness. *See, Barefoot v. Estelle*, 463 U.S. 880, 896–903, 103 S.Ct. 3383, 3396–3399, 77 L.Ed.2d 1090 (1983). *See also, Barefoot v. State*, 596 S.W.2d 875, 887 (Tex.Cr.App.1980); and, *Robinson v. State*, 548 S.W.2d 63, 66 (Tex.Cr.App.1977). And, on appeal, we have repeatedly recognized the importance of such expertise when determining the sufficiency of the evidence to support an affirmative answer to the future dangerousness punishment issue. *Ellason v. State*, 815 S.W.2d 656 (Tex.Cr.App.1991); *Huffman v. State*, 746 S.W.2d 212 (Tex.Cr.App.1988); *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr.App.1987); *Warren v. State*, 562 S.W.2d 474 (Tex.Cr.App.1978).

Additionally, this Court indicated in *Rey*, 897 S.W.2d at 341:

> In cases holding that a sufficient showing was not made under *Ake*, the defendant typically has failed to support his motion with affidavits or other evidence in support of his defensive theory, an explanation as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert and proof.

This was not the case here, as appellant provided ample support in both of his motions.

Furthermore, the majority opinion contends appellant did not need the assistance of Blau because Brantley denied that he would rely upon profiling techniques. Ante at 287. However, the relevant question is whether the State called Brantley as an expert witness specifically for his expertise in "threat analysis." The answer to that question is obviously yes. Brantley would not have testified in the instant case but for this expertise. And because his expertise was in a unique and complex technique which stems from an ambiguous discipline, appellant was entitled to expert assistance on this same technique.

Finally, I pause to mention there is evidence in the record that the State was in fact attempting to elicit a "profile" from Brantley, and that Brantley appears to have been "profiling" appellant but calling it an "assessment:"

BRANTLEY: Well, in my opinion based upon the totality of everything that I had access to and everything I reviewed and all the people I talked to it's my opinion that the probability of the offender here, Mr. Griffith, engaging in future acts of violence consistent with his past behavior is quite high.

STATE: Did you discover any *profile* regarding sexual motivations of Mr. Griffith?

BRANTLEY: You said—you used the word *profile*.

STATE: I'm sorry. *Assessment*.

Because the trial judge erred in denying appellant's motion requesting funds to employ Blau, this case should be remanded to the trial court for a new punishment hearing. Tex.Code Crim. Proc. Ann. art. 44.29(c). Because the majority does not, I dissent.

OVERSTREET and PRICE, JJ., join this opinion.