NO. 07-02-0501-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JANUARY 13, 2003

_____

RONALD WAYNE PRICE, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE 110TH DISTRICT COURT OF MOTLEY COUNTY;

NO. 2058; HONORABLE JOHN R. HOLLUMS, JUDGE

_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

In this appeal, appellant Ronald Wayne Price challenges his conviction of murder and the ensuing punishment of 30 years confinement in the Institutional Division of the Department of Criminal Justice. In pursuing the appeal, he contends: 1) the evidence is factually insufficient to support the jury's verdict that he did not act in self-defense, and 2) the trial court erred in denying his request for the appointment of an expert on confessions,

_____

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2004).

thereby depriving him of a) due process of law, b) constitutionally required effective assistance of counsel, c) constitutionally required equal protection rights, and d) the benefits of the mandates of article 26.05 of the Texas Code of Criminal Procedure. Disagreeing that reversal is required, we affirm the judgment of the trial court.

Facts

The questions presented by this appeal require a somewhat detailed recitation of the relevant evidence. On March 13, 2002, at about 9:05 p.m., Motley County Sheriff Jim Meador (Meador) received a call at his residence about a stabbing that had occurred at Sarah Ho–Gland's (Sarah's) residence in Roaring Springs. Meador proceeded to that house accompanied by Deputy Ricky Lawrence (Lawrence). Upon their arrival, they found a man later identified as Alvin "Al" Pettitt (Pettitt), lying unconscious on the floor of the house. Appellant was also present at the scene bleeding from some knife cuts.

Meador testified that appellant appeared to have been in some sort of an altercation and was cut and bleeding. He said the scene around the house was "chaotic" when he arrived with people inside and outside of the residence screaming and highly agitated. Although he averred that he did not consider appellant under arrest, Meador handcuffed appellant and read him his Miranda rights. In the process of securing the scene and to ensure the safety of EMS personnel who were en route to the house, Meador removed a knife he found on an end table in the living room and placed it in his vehicle. After the deceased's body was removed from the scene, Meador replaced the knife on the end table and raised the foot rest on the chair adjacent to the end table. He told Lawrence to take

2

appellant to the sheriff's office and he did not have any other contact with appellant that day. It is uncontroverted that the victim, Pettitt, died as a result of stab wounds inflicted upon him by appellant.

As he was being transported to the sheriff's office, appellant told Lawrence that Pettitt was the aggressor and that he was forced to stab Pettitt in self defense. Subsequently, Jay Foster (Foster), a Texas Ranger, arrived and, after again giving appellant his Miranda warnings, took a recorded interview from appellant. In the course of that interview, appellant said that he and his son, Josh Price, went over to Sarah's house to return some FFA ribbons to Sarah's son, William (William). He said that Sarah was his ex-wife and he still had some of her "stuff" in his house. As he and his son approached the front door, he saw Pettitt sitting in a chair just inside the front door. He averred that he knew from past experience that Pettitt was unpredictable and he did not want his son around him. Appellant asked Pettitt where Sarah was, and Pettitt replied that she was across the street at her parent's house. Appellant said he then told his son to go to Sarah while he, appellant, went into the house where Pettitt was located.

Appellant averred that he had started to put the ribbons on the kitchen table when Pettitt told him to put them on the living room table where Pettitt was located. He said he began talking to Pettitt and Pettitt accused him of trying to get Sarah back. Pettitt jumped out of his chair, appellant continued, and swung at him. As appellant tried to move out of the way, he noticed that Pettitt had cut him on his face. He asserted that Pettitt told him that he was going to kill him and he believed his life was in danger. He said everything

3

happened rapidly and the pair struggled by the front door and by the chair in which Pettitt had been seated. Appellant stated he tried to get Pettitt's knife away from him but was unable to do so and, after Pettitt had stabbed him again on the shoulder, he drew his knife and stabbed Pettitt.

In the interview, appellant admitted that he knew from past experience that Pettitt was a violent and unpredictable man and anything could happen around him. Albeit with an explanation that he worked at his aunt's restaurant and cut up different food items, appellant admitted he habitually carried more than one knife. He denied that he went over to Pettitt's house looking for a fight and felt that if he had not pulled his knife, he "would have died there."

After interviewing other witnesses at the scene, including Sarah and her son William, Foster asked appellant additional questions. In the course of that interrogation, appellant admitted he had gone over to Sarah's house recently and had shown Pettitt a gun. He denied that he threatened Pettitt with the gun, but averred that he simply handed it to Pettitt, who handed it back. He denied telling Sarah that he was going to shoot Pettitt or that he and Pettitt had been involved in a knife throwing contest the previous Saturday. When asked why he locked the door to the house in which the stabbing took place, appellant replied that he closed the door because he did not want Sarah to see Pettitt "that way." He also averred that he had no recollection of locking the door after the stabbing.

Foster testified that he thought it was strange that appellant left his son outside when appellant knew of Pettitt's propensity toward violence. He also said he would have

4

expected appellant to have more defensive wounds if he had been engaged in a knife fight with a bigger and stronger man.

Sarah testified that she and appellant had been married for about five years prior to their divorce in September 2000. Pettitt had been living with her for about a month. She said that although Pettitt was a drinker and could become violent when drunk, he had recently stopped drinking at her request. On March 13, 2002, the date in question, Pettitt left early accompanied by his boss, Ross Graham. He returned that evening and sat in his recliner with a glass of tea. Sarah left her house about 9:00 p.m. to visit her parents, who lived across the street. While she was there, Josh Price showed up and the pair started back to Sarah's house. As they did so, they met William and his girlfriend, Jamie Balk, and the group continued toward Sarah's house. As they approached the house, appellant closed and locked the front door and Sarah heard a thump on the floor.

Sarah also testified appellant had called her the day before the occurrence and said he wanted to shoot Pettitt but he did not know why. The night before the incident, she said, appellant came over to her house and showed Pettitt a gun which Pettitt looked at and returned to appellant. She also said that at that time, the two shook hands and agreed to be friends.

William testified that on March 13, Pettitt had returned home from work tired, sat down with a glass of iced tea, and was watching television. William left to pick up his girlfriend and when they returned, appellant and Pettitt were sitting down. Pettitt was watching television and appellant was talking to him. William and his girlfriend went over

5

to Sarah's parent's house to get Josh. The pair met Sarah and Josh and they returned to Sarah's house. As they got to the front door, "it shut and locked." He heard someone saying "Al, don't. Al, stop." William and Jamie went to the back door and as they entered, they saw Pettitt lying on the floor bleeding. William also testified that appellant was at a party at Sarah's house about a week or so before the stabbing incident, and Pettitt and appellant threatened to go outside and throw knives at each other.

Meador testified that about 1:30 a.m. on March 15, 2002, appellant called his residence and wanted the sheriff to meet with him at an Alsup's store in Matador. When the sheriff arrived at the store, appellant told the sheriff he wanted to talk. The sheriff again recited Miranda rights to appellant. Appellant then told Meador that he had "killed Al." He said he had gone over to Sarah's house to deliver the ribbons. When he arrived, Pettitt was there, seated in a recliner chair, and told appellant to place the ribbons on a table adjacent to the chair. Appellant then took out his knife and showed it to Pettitt. Pettitt handed the knife back to him and he stabbed Pettitt. He then took Pettitt's knife and cut himself. Appellant did not mention to Meador any aggression on the part of Pettitt that might have provoked his attack.

Meador then called Foster, who took a written statement from appellant that was received into evidence. The written statement was much the same as appellant's oral statement to the sheriff.

6

## Factual Sufficiency

In the recent case of *Zuliani v. State*, 97 S.W.3d 589 (Tex. Crim. App. 2003), the court had occasion to explicate the standard by which we review the factual sufficiency of the jury's rejection of a self-defense assertion. In explication of that standard, the court explained:

> . . . the reviewing court reviews all the evidence in a neutral light and asks whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence.

*Id.* at 595.

In the light of that instruction, we have carefully examined all the evidence in this case and have concluded that it is sufficient to sustain the jury's verdict. This is particularly true in view of appellant's various inconsistent and incriminating statements, and all of the surrounding circumstances and testimony we have listed above. Accordingly, appellant's first issue must be, and is hereby, overruled.

As we have noted, in his remaining four issues, appellant contends that the refusal of the trial court to appoint him an expert on confessions deprived him of various constitutional and statutory rights, as well as the effective assistance of counsel. In reviewing that denial, we must determine if the trial court abused its discretion in refusing appellant's request. *Griffith v. State*, 983 S.W.2d 282, 287 (Tex. Crim. App. 1998), *cert. denied,* 528 U.S. 826, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999).

7

The seminal case in the area of the necessity for appointment of experts for an indigent defendant is *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct.1087, 84 L.Ed.2d 53 (1985). In *Ake*, the defendant sought the appointment of a psychiatrist to assist on the issue of the defendant's sanity at the time of the offense. In considering the defendant's request, the *Ake* Court explained that due process requires access to raw materials integral to the building of an effective defense. Even so, it went on to say that a state need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," but rather must provide him the basic tools to present his defense within our adversary system. *Id.* 470 U.S. 77, 105 S.Ct. 1093. To decide whether the appointment of a particular expert is a "basic tool" within the purview of the *Ake* instruction in a given case, a reviewing court must consider three factors. *Id.; Norton v. State*, 930 S.W.2d 101, 105 (Tex. App.–Amarillo 1996, pet. ref'd). Those factors are: 1) the private interest that would be affected by the action of the State; 2) the governmental interest that will be affected if the safeguard is to be provided; and 3) the probable value of the additional or substitute procedural safeguards that are sought and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Ake,* 470 U.S. at 77*,* 105 S.Ct. 1093; *Norton*, 930 S.W.2d at 105. Moreover, the reviewing court must bear in mind that the government is only required to provide indigent defendants with expert assistance in cases in which the defendant has made a sufficient threshold showing. To be sufficient, that threshold showing must establish that not only does there exist a reasonable probability that an expert would be of assistance, but also that the denial of the requested expert assistance would result in a fundamentally unfair trial. *Norton*, 930 S.W.2d at 106-07.

8

In this case, the defense was given money for both a crime scene expert and a psychiatrist. The psychiatrist was called to testify for appellant. In his written motion, appellant claimed he needed the confession expert because of appellant's background, his health disorders, and mental illness. However, he did not support these allegations by pertinent evidence.

This record does not show that the trial court's refusal to appoint the requested confession specialist resulted in a fundamentally unfair trial. This is particularly true in view of the trial court's appointment of a psychiatrist and a crime scene expert. Thus, the trial court did not abuse its discretion in refusing to appoint a confession expert. That being so, its refusal to do so did not deprive appellant of any of his constitutional or statutory rights, nor did it deprive him of the effective assistance of counsel. Appellant's second through fifth issues are overruled.

In summary, all of appellant's issues are overruled and the judgment of the trial court is affirmed.

John T. Boyd
Senior Justice

Do not publish.

9