NO. 12-99-00182-CR



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


BERNHARDT TIEDE, II,
§
 APPEAL FROM THE 123RD

APPELLANT


V.
§
 JUDICIAL DISTRICT COURT OF


THE STATE OF TEXAS,

APPELLEE
§
 PANOLA COUNTY, TEXAS

 

OPINION ON REMAND


 Bernhardt Tiede, II was convicted of murder and sentenced by the jury to life imprisonment
and a $10,000 fine. He appealed and this court affirmed the conviction, but reversed and remanded
the cause for a new hearing on punishment. The court of criminal appeals vacated our judgment and
remanded the cause to us for reconsideration of the character and harmfulness of the trial court's
exclusion of Appellant's expert's proffered testimony. Finding the error harmless, we affirm the trial
court's judgment.


Background

 In his sixth and seventh issues originally before this court, Appellant asserted the trial court
erred by excluding certain testimony by his expert, Dr. Frederick Mears, concerning his lack of future
dangerousness and his mental condition during and after the offense. He argued that the excluded
evidence was admissible pursuant to Texas Code of Criminal Procedure article 37.07, section 3(a)
because it was relevant to mitigation of punishment. Asserting that he had a constitutional right to
introduce the evidence, Appellant claimed he could not present a complete defense at the punishment
phase without it.

 Upon original submission, we agreed the trial court erred in excluding the testimony,
determined that the error was a constitutional one, and conducted a harm analysis pursuant to Texas
Rule of Appellate Procedure 44.2(a). Finding harm, we remanded the cause to the trial court for a
new punishment hearing. Tiede v. State, No. 12-99-00182-CR, 2000 Tex. App. LEXIS 4397 (Tyler
June 30, 2000), rev'd, 76 S.W.3d 13 (Tex. Crim. App. 2002). However, the court of criminal appeals
granted the State's Petition for Discretionary Review to determine whether we erred in holding that
the trial court's exclusion of the expert's proffered testimony was constitutional error subject to the
harmless error standard of rule 44.2(a). Directing our attention to its recent decision in Potier v.
State, 68 S.W.3d 657 (Tex. Crim. App. 2002), that court vacated our judgment and instructed us to
reconsider our prior decision. Pursuant to that directive, we revisit the question of whether the trial
court's exclusion of Appellant's expert's testimony regarding the issues of sudden passion, adequate
cause, future dangerousness, and Appellant's behavior after the offense is constitutional error. To
guide us, the court of criminal appeals instructed us to analyze the relationship between: 1)
Appellant's original proffer of and rationale for Dr. Mears' testimony; 2) the trial court's original
ruling; 3) Dr. Mears' full testimony before the jury; and 4) Appellant's proffer of additional testimony
made after Dr. Mears completed his testimony.


Evidence at Issue

Voir Dire

 Outside the presence of the jury, and before he testified in front of the jury, the State took Dr.
Frederick Mears, Appellant's expert, on voir dire. Dr. Mears, a clinical psychologist and
neuropsychologist, examined Appellant three times. He explained that he could give his opinion
about Appellant's mental state, whether it fits in with what is known about traditional mental
disorders and whether it meets those standards. Dr. Mears said he was going to testify that Appellant
does not suffer from any known psychiatric disorders, mood disorders, anxiety disorders,
communication problems, or learning disabilities, and that he has a normal intelligence. Dr. Mears
found Appellant to "have a clear sensorium and be in touch with what was going on during" his
evaluation.

 The following colloquy took place between the prosecutor and Dr. Mears:


 [State]: In your opinion, was he overcome by sudden passion at the time he killed Mrs. Nugent on
November 19th, 1996?


 Dr. Mears: I don't know whether I would say that he was overcome by sudden passion. I think that he
was different during that time than he had been throughout the rest of his time with her and throughout
most of his other history. I think there was some stress factors in and around that time that certainly
played a role in the behavior that he did.


 But to use those legal terms which are not really consistent with - I think with psychopathological
terms, I don't know if I would call it sudden passion, that sudden passion drove him to that. I don't
know that I would say that.


 [State]: So you wouldn't say that?


 Dr. Mears: I don't know what I would state in that. I would probably select other terms to show that
I think that there were some changes in him during that time.

 . . . .


 [State]: Well, what is the defendant suffering from?


 Dr. Mears: I don't know if he's suffering from anything. I think he - from what he reported to me -
and he didn't do this to take himself out of being guilty.


 He told me that he had an experience - at my insistence, he didn't offer this. Did he have any unusual
sensations or feelings? And the only thing he said that I thought was rather interesting is he said when
he shot her that he felt out of his body.


 And that's a pretty classic kind of dissociative feature. And I certainly thought he had some
dissociative features, but not enough to really make him what we would call a multiple personality,
dissociative identity disorder, -


 . . . .


 I didn't see him to have any of these classic dissociative disorders such as very serious ones like
multiple personality or dissociative identity disorders, now called, or dissociative views or dissociative
amnesias.


 I thought he might have had some dissociative - episodic dissociative event because of the very unusual
things about his telling me that he seemed a little bit away from the thing. His perspective seemed
away. And that's a very classic feature of a dissociative episode.


 Now, I don't know if that - how that fits in. It's certainly not to be - I'm not proposing that that's
psychosis. I'm not proposing that he didn't know the difference between right or wrong, which I think
he did. I'm just relating to what -


 . . . .


 [State]: Doctor, do you understand that the definition of "sudden passion" means "passion directly
caused by and arising out of provocation by the individual or another acting with the person killed,
which passion arises at the time of the offense and is not solely the result of former provocation"?


 Dr. Mears: Yes, I understand that.

 . . . .


 [State]: "Adequate cause" means "cause that would commonly produce a degree of anger, rage,
resentment or terror in a person of ordinary temper sufficient to render the mind incapable of cool
reflection."


 . . . .


 Dr. Mears: Yes. And I would agree that I think he had some of those elements of not being able to
have cool reflection. Yes, I think so.

 

 [State]: You're going to testify that his mind was incapable of cool reflection?


 Dr. Mears: I think it not incapable. Again, we're arguing with a legal and the psychopathological
definitions. I don't know that I would say was [sic] incapable. I would say it was certainly degraded.


 [State]: Degraded?


 Dr. Mears: Degraded. Lessened.



Trial Court's Ruling

 After voir dire of Dr. Mears was completed, the prosecutor objected to the admissibility of
his testimony. The following exchange occurred as defense counsel summarized Dr. Mears'
proposed testimony and the trial court explained its limitations on Dr. Mears' testimony:


 [Defense Counsel]: Mr. Mears will testify regarding those punishment issues that relate to sudden
passion and adequate cause. He will testify concerning whether or not the kinds of stressors that were
evident from the testimony of the defendant are the kinds of stressors that can result in building such
a degree of resentment as to affect the ability of the mind for cool reflection.


 The Court: He's going to state that in general?


 [Defense Counsel]: That's correct.


 The Court: Not about this particular defendant?


 [Defense Counsel]: That's correct. He'll talk about dissociation, Your Honor, and those kinds of things
that he's told counsel that he was going to testify to.


 . . . .


 I doubt seriously anybody on this jury has any knowledge of dissociative conditions that can exist in
the mind of a human being and how they affect the mind of a human being. I doubt seriously that any
of the jurors are familiar with DSM4 and with the PTSD, the psychological effects of depression, those
kinds of matters that Dr. Mears is an expert in.


 . . . .


 The Court: Well, here is what I'm going to do. I'm going to permit him in general, not about this
particular defendant. Just to testify as to those clinical disorders that you have just enumerated there,
[counsel], and nothing else.


 . . . .


 In other words, nothing else about his impressions about the remorsefulness of the defendant. I think
that's left up to the prerogative of the jury. That's the reason we have a jury.


 . . . .


 [B]ut I'm saying in general only. And that's as far as I'm going to permit it. I'm not going to allow
anything specific and only as to those particular disorders to explain to the jury what those disorders
are in lay terms. That's the only thing I'm going to permit him to do.



Testimony Before the Jury

 Dr. Mears then testified before the jury. He stated that he met with Appellant but did not state
his findings or offer any diagnosis of Appellant. Upon direct questioning by defense counsel, the
following occurred:


 [Defense Counsel]: Dr. Mears, based on your background, your experience and your education, could
you - do you have an opinion as to whether or not it is possible for one to be so overcome by
possessiveness, demanding nature of another, that it would produce such a degree of resentment that
would render that person, an ordinary person, a person of ordinary temperament, incapable of cool
reflection? Do you have an opinion about that?


 Dr. Mears: Yes. I have an opinion about that.


 [Defense Counsel]: What is that opinion?

 

 Dr. Mears: I think that is possible.


 [Defense Counsel]: Under what circumstances?


 Dr. Mears: Under a high degree of stress, under a high degree of insufficient options for people,
insufficient resources, networks, number of different kinds of stress conditions could limit people's
options. And also some personality factors that the person might have could also limit their abilities
to make other decisions that might take them out of a stress encounter, maybe more dependent people
might be caught in a web in which they couldn't get out of.


 [Defense Counsel]: Is there a psychological term or psychological condition that might explain that? 
Is there any - whatever you call them?


 . . . .


 Dr. Mears: I don't think there is a psychological term other than we could say that somebody is under
excessive stress and doesn't have much control. It's not the term that we were previously talking about. 
Dissociative condition, it's not that term.


 [Defense Counsel]: What is dissociative condition?


 Dr. Mears: Dissociation often grows out of some excessive stress in which individuals can't escape. 
And it's an individualized reaction, dissociation is. Not everybody has dissociation. But it's a situation
in which the person can really more or less become somewhat different than they normally were. . . .
So some people can become dissociative, and that means they really are sort of engaging in a high level
of repression where they can almost develop two different aspects of themselves. Not a Dr. Jekel - Mr.
Hyde kind of thing. But can have two different kinds of personalities, so to speak, or different kinds
of behavior. And in some cases, that can be stress-induced.


 [Defense Counsel]: Can dissociation, could that condition explain one's ignoring circumstances that
they had produced and caused?


 Dr. Mears: I think if they've had a history, a child history of trauma, if they've had an occupational
history in which they've had to dissociate to survive their occupational history, such as being a
pathologist where you work with bodies or things like that and are very traumatic, I think those people
often develop pretty regulated and controlled dissociation, because they don't like to go home with all
this knowledge of all the horrible things they do. . . . And they're not criminals, but they can - I mean,
they're not psychopathic because they do that. They've learned that.


 So to answer your question, I think an occupational history of certain occupations can really make
certain people learn to use a repressive technique for dealing with a lot of highly stressful situations.


 [Defense Counsel]: Funeral directors?


 Dr. Mears: Funeral directors, morticians, embalmers, certainly that are around those kinds of most
horrible things that most of us think about.



Bill of Exception

 After the conclusion of Dr. Mears' testimony before the jury, defense counsel made a bill of
exception outside the presence of the jury offering additional testimony. Counsel asked about
Appellant's mental status at the time Dr. Mears interviewed him:


 Dr. Mears: He had some elements of mental - most of his elements of mental status were clear and
completely normal. No symptoms of delusions, hallucinations, psychotic features, no speech
impairments, no signs of mental retardation, no attentional deficits, no concentration impairments.


 The only thing that I found in my opinion that seemed to be of significance was that he did seem to
have some dissociative episodes, particularly when he started describing what he did when he shot Mrs.
Nugent.


 [Defense Counsel]: In your conversations with him and in the history that you took, did you get a
history of his relationship with Mary Nugent?


 Dr. Mears: Yes, I did.


 [Defense Counsel]: Did you determine that that relationship had many features of a domestic
relationship?


 Dr. Mears: Certainly it did.


 [Defense Counsel]: Explain that for the jury.


 Dr. Mears: I think it had a clear mother-son, son-mother relationship. Somewhat of a parasitic
relationship on both of their parts. I think it became more intense and perhaps more demanding on both
of their parts as the years progressed and maybe as her loss of her husband and alienation from her son
occurred. So I think maybe she naturally was depending on Bernie more than she would have if she
had a better social network.


 [Defense Counsel]: The history you obtained, was it a history of a possessive and a demanding
relationship from Marj Nugent to Bernie Tiede?


 Dr. Mears: I think near the end there were certainly elements of that.


 [Defense Counsel]: I asked you earlier about - about cool reflection. You gave us your opinion
regarding that. Let me ask you this. If there was evidence after Bernie Tiede's arrest that his affect
or outward manners were flat and dead pan, I think was the word, can that be explained in any
psychological terms?


 Dr. Mears: That was another feature that supports the dissociative disorder diagnosis that I had
provisionally had because that is one of the features - one of the features of dissociation, is to be sort
of out of it, not in touch with what's going on, particularly under heightened stress.


 We see those kinds of things in a lot of people in natural disasters, earthquakes or even in murder cases
where people seem to be not quite with it.


 [Defense Counsel]: What is the term "numbing derealization"?


 Dr. Mears: Numbing derealization is often a symptom reported by those who have been exposed to
some trauma, even if they created it or, in a common sense, as in earthquakes or natural disasters is very
common.


 [Defense Counsel]: Is that outward manifestation, that flat affect and dead pan situation, is that - is that
akin to shock?


 Dr. Mears: It could be. Of course, "shock" being a neurological term. Maybe you might want to say
it's a psychological shock. It's a bracing pattern.


 It is certainly not characteristic for the way Mr. Tiede has carried on and conducted himself, being a
highly verbal individual. So that really supports somewhat that there was something going on that he
suddenly becomes very nonverbal.


 [Defense Counsel]: And with regard to depression, did you find depression as being part of that?


 Dr. Mears: Yes. I think there was obviously some depression.


 . . . .


 [Defense Counsel]: [T]here was evidence that for nine months after Mrs. Nugent's death Bernie
Teide's activities were - he was involved in recreational, took trips, went to dinners, was active in the
church, preached in the church, involved himself in all kinds of things after the death and before his
arrest. Can that conduct be explained psychologically?


 Dr. Mears: I think it can. I think that it fits in really well with the dissociation model, as we see in many
- not to say that he's a traumatized child. But many traumatized children have this same kind of ability
to put very traumatic events sort of out of awareness and go about business as it normally was, not to
imply that he was abused by the deceased, not at all.


 But the mechanism is still there when people are under a high degree of stress. Certainly individuals
do engage in dissociative episodes.


 . . . .


 [Defense Counsel]: Dr. Mears, based on your evaluation of Mr. Tiede, as well as the psychological
tests administered to him by you, do you believe in reasonable probability that Mr. Tiede would pose
a threat or a danger to anyone in the future?


 Dr. Mears: It is my opinion he absolutely would not pose a threat or danger to inmates, cell mates,
guards, anyone else in that system.



Standard of Review

 The court of criminal appeals has recently clarified the standards applicable to our analysis. 
Reviewing United States Supreme Court cases, the court of criminal appeals noted that certain
egregious evidentiary errors may violate the Due Process Clause of the Fourteenth Amendment. See
Potier, 68 S.W.3d at 660. The court of criminal appeals explained there are two distinct scenarios
in which rulings excluding evidence might rise to the level of a constitutional violation: 1) a state
evidentiary rule which categorically and arbitrarily prohibits the defendant from offering otherwise

relevant, reliable evidence which is vital to his defense; and 2) a trial court's clearly erroneous ruling
excluding otherwise relevant, reliable evidence which "forms such a vital portion of the case that
exclusion effectively precludes the defendant from presenting a defense." Id. at 662, 665. 

 The first category involves an arbitrary rule of evidence. The second category involves an
appropriate rule that the trial court has erroneously applied to exclude admissible evidence to such
an extent that it effectively prevents the defendant from presenting his defensive theory. Wiley v.
State, 74 S.W.3d 399, 405 (Tex. Crim. App. 2002). However, erroneous evidentiary rulings rarely
rise to the level of denying the fundamental constitutional right to present a meaningful defense. 
Potier, 68 S.W.3d at 663.


Applicable Law

 Penal Code section 19.02(d) provides that, upon a showing that the defendant caused the
victim's death under the immediate influence of sudden passion arising from an adequate cause, the
offense becomes punishable as a second degree felony, rather than a first degree felony. See Tex.
Pen. Code Ann. § 19.02(d) (Vernon 1994). "Sudden passion" is defined by the Penal Code as
"passion directly caused by and arising out of provocation by the individual killed or another acting
with the person killed which passion arises at the time of the offense and is not solely the result of
former provocation." Tex. Pen. Code Ann. § 19.02(a)(2) (Vernon 1994). "'Adequate cause' means
cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of
ordinary temper, sufficient to render the mind incapable of cool reflection." Tex. Pen. Code Ann.
§ 19.02(a)(1) (Vernon 1994). In considering whether any evidence is raised on this issue, the
reviewing court considers the record from both the guilt-innocence and punishment phases of the
trial. Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

 To be entitled to an affirmative finding of sudden passion, the record must contain objective
evidence that direct provocation by the victim occurred at the time of the killing. Merchant v. State,
810 S.W.2d 305, 310 (Tex. App.-Dallas 1991, pet. ref'd). Evidence of prior provocation alone is not
enough. Id. Additionally, the record must contain evidence from which the jury could subjectively
decide the accused killed the victim while in an excited and agitated state of mind arising out of the
direct provocation. Id. There must be evidence that the accused acted in the throes of actual,
subjective passion. Id. The objective inquiry into "adequate cause" also has two parts. First, the
record must contain some evidence of legally adequate cause. Id. Second, the cause must be the kind
that would produce anger, rage, resentment or terror in a person of ordinary temper so that the person
is incapable of cool reflection. Id.

 An appellant's potential for being a future danger is a question of fact for the jury. Griffith
v. State, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998). The court of criminal appeals has outlined
a nonexclusive list of factors that may be considered in determining whether a defendant constitutes
a continuing threat to society: 1) the circumstances of the offense, 2) the calculated nature of the
defendant's acts, 3) the forethought and deliberateness exhibited by the crime's execution, 4) the
existence of a prior criminal record, 5) the defendant's age and personal circumstances at the time
of the offense, 6) whether the defendant was acting under duress or the domination of another at the
time of the commission of the offense, 7) psychiatric evidence, and 8) character evidence. Solomon
v. State, 49 S.W.3d 356, 362-63 (Tex. Crim. App. 2001). The facts of the offense alone can be
sufficient to show future dangerousness. Id. at 363. In deciding whether a defendant poses a
continuing threat to society, a jury considers not only free society, but also prison society. Morris
v. State, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996).


Discussion

 This case does not involve a complaint that a state evidentiary rule categorically and
arbitrarily prohibited Appellant from offering evidence. If the error is constitutional, it must be
because the ruling excluded otherwise relevant, reliable evidence which "forms such a vital portion

of the case that exclusion effectively precludes [Appellant] from presenting a defense." Potier, 68
S.W.3d at 665. 

 Appellant argues that by excluding certain portions of Dr. Mears' testimony, the trial court
violated his constitutional right to present a defense. Specifically, Appellant contends that he (1) was
prohibited from offering evidence of his mental state as it related to the punishment issues of sudden
passion and adequate cause, (2) was not permitted to connect "in an expert fashion" the academic
explanation of dissociative behavior to Appellant and his conduct, and (3) could not elicit expert
testimony regarding his future dangerousness.

Sudden passion/adequate cause

 On voir dire, when asked whether Appellant was overcome by sudden passion at the time he
killed Mrs. Nugent, Dr. Mears responded, "I don't know if I would call it sudden passion, that sudden
passion drove him to that." He also said Appellant was "not incapable" of cool reflection; rather, his
ability to engage in cool reflection was "degraded" and "lessened." 

 After the State made its objection, Appellant asked to present testimony of sudden passion
and adequate cause in general. Before the jury, Dr. Mears explained that a person of ordinary
temperament who is overcome by the possessiveness of another might, while under a high degree of
stress, be rendered incapable of cool reflection. 

 Dr. Mears' proposed testimony did not include evidence that Mrs. Nugent provoked Appellant
at the time of the murder or evidence that Appellant killed her while in an excited and agitated state
of mind arising out of a direct provocation by Mrs. Nugent. His testimony did not indicate that, at
the time of the murder, anything occurred that would produce in Appellant a degree of anger, rage,
resentment, or terror, sufficient to render Appellant incapable of cool reflection at the time he killed
Mrs. Nugent. Moreover, in his original proffer, Dr. Mears refused to say that Appellant was driven
by sudden passion or that he was incapable of cool reflection.

 Further, Appellant stated in his confession that he had thoughts of killing Mrs. Nugent "for
a couple of months" prior to the murder. He explained that, prior to the murder, he placed the murder
weapon in a convenient location. He shot Mrs. Nugent in the back as she walked away from him into
the garage. This evidence shows premeditation. Other evidence shows that, rather than provoking
Appellant, Mrs. Nugent was not only walking away from Appellant at the time, but also had bent
down to pet her dog when Appellant shot her. This is not evidence of provocation by Mrs. Nugent. 
Nor is this evidence that Appellant suffered from an agitated state of mind arising out of direct
provocation. 

 Moreover, at the punishment phase, Appellant had the opportunity to explain his need to kill
Mrs. Nugent. He explained that Mrs. Nugent became progressively more demanding and possessive,
and he felt as if he was being smothered and choked. He felt as if he was in prison. His resentment
built up and he could not find a way out of the situation. Also, the jury heard Dr. Mears' explanation
of how an individual under a high degree of stress who was overcome by the possessiveness of
another could be rendered incapable of cool reflection. Thus, the theory by which Appellant hoped
to avail himself of the favorable application of Penal Code section 19.02(d) was before the jury.

 Dr. Mears' proposed testimony, that which was not before the jury, did not include evidence
of sudden passion arising from an adequate cause as those terms are defined by statute. Therefore,
even if the evidence had been allowed, it would not have the hoped-for benefit of lowering the
applicable punishment range to a second degree felony. Accordingly, the trial court's refusal to allow
the tendered evidence did not deprive Appellant of the opportunity to present a defense pursuant to
Penal Code section 19.02(d). As a result, exclusion of the evidence did not "preclude [Appellant]
from presenting a defense" on a vital portion of the case, and was not, therefore, constitutional error. 
Potier, 68 S.W.3d at 665.

Relationship between Appellant's conduct and mental state

 Dr. Mears explained on voir dire that he would testify that Appellant does not suffer from any
known psychiatric disorders, mood disorders, or anxiety disorders. Based on Appellant's statement
that he felt out of his body when he shot Mrs. Nugent and that his "perspective seemed away," Dr.
Mears "thought he might have had some dissociative - episodic dissociative event." He qualified his
statement explaining that Appellant did not exhibit enough dissociative features to warrant a
diagnosis of dissociative identity disorder. After the State made its objection, Appellant asked to
present testimony of an explanation of the disorder of dissociation in general. The trial court allowed
Dr. Mears to testify about clinical disorders in general. 

 Before the jury, Dr. Mears explained dissociative condition, stating that one who is
dissociative is engaging in a high level of repression. He indicated that it is likely that a funeral
director would develop the condition. For the bill of exception, Dr. Mears testified about Appellant's
mental status at the time Dr. Mears interviewed him. He explained that Appellant and Mrs. Nugent
had a parasitic type of mother-son relationship. He further explained that Appellant was experiencing
some depression and seemed to have some dissociative episodes during which he was not in touch
with what was going on and was able to put the traumatic event of Mrs. Nugent's death out of his
awareness and go about his usual business. 

 Appellant complains that he was not allowed to present mitigating punishment evidence in
the form of testimony explaining dissociative behavior. The jury heard Appellant's confession
explaining how he shot Mrs. Nugent, hid her body, and then went about his usual business for nine
months until the body was found. Appellant testified that if he had been thinking about the murder,
it would not have felt very good, but he had not thought about it. He answered affirmatively when
asked if he had put it out of his mind. The jury heard Dr. Mears' explanation of dissociation and his
statement that a funeral director could develop the condition. The jury could easily put all this
evidence together and consider the possibility that Appellant was experiencing dissociation in the
nine months after the murder. Accordingly, as the evidence of dissociative behavior was before the
jury, Appellant was not prevented from presenting this defensive issue. 

Future dangerousness

 Appellant also wanted to show his lack of future dangerousness to mitigate punishment. His
proffered evidence on this issue consisted of one sentence by Dr. Mears presented in the bill of
exception: "It is my opinion he absolutely would not pose a threat or danger to inmates, cell mates,
guards, anyone else in the system." The issue of future dangerousness did not arise during voir dire
of Dr. Mears.

 In considering the question of future dangerousness, the jury could look to numerous factors
in the record including the evidence that Appellant had a close relationship with Mrs. Nugent for a
number of years. The jury could consider the circumstances of the offense. Mrs. Nugent was a
strong-willed woman who became more and more demanding which caused Appellant to feel
increasingly more pressured. Eventually, he could not take it anymore and killed her. The jury knew
that Appellant, who had no prior criminal record, had been enjoying Mrs. Nugent's wealth. Further,
Appellant presented character witnesses who testified as to his good character and generous, kind,
and compassionate nature. Taking all these facts together, the jury might have believed this was a
unique situation and that, in the absence of exact duplication of the situation, Appellant would not
necessarily commit dangerous acts in the future. Accordingly, as there was evidence before the jury
from which it could form an opinion as to Appellant's future dangerousness, the trial court's refusal
to allow Dr. Mears' statement regarding Appellant's future dangerousness within the prison system
did not prevent Appellant from presenting his defensive theory on this issue. 

 We previously determined that this case does not implicate the first category of rulings
excluding evidence that might rise to the level of a constitutional violation as this case does not
involve an arbitrary rule of evidence. Further, although the trial court erroneously excluded otherwise
relevant, reliable evidence, the excluded evidence does not form "such a vital portion of the case that
exclusion effectively precludes [Appellant] from presenting a defense." Potier, 68 S.W.3d at 665. 
It follows that the trial court's erroneous refusal to allow the proffered testimony is non-constitutional
error. See id.


Harm Analysis

 Texas Rule of Appellate Procedure 44.2(b) provides that a non-constitutional error "that does
not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b). Substantial rights are not
affected by the erroneous admission of evidence "if the appellate court, after examining the record
as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." 
Solomon, 49 S.W.3d at 365. The appellate court should consider everything in the record, including
any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence
supporting the verdict, the character of the alleged error and how it might be considered in connection
with other evidence in the case. Motilla v. State, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). The
reviewing court may consider the jury instructions, the State's theory and any defensive theories,
closing arguments, whether the State emphasized the error, and even voir dire, if applicable. Id. at
355-56. Further, the presence of overwhelming evidence of guilt can be considered. Id. at 356. 

 The record shows that after forming a close relationship with Mrs. Nugent, a wealthy widow,
Appellant grew resentful because of her possessiveness. Finally, after considering murder for two
months, Appellant shot Mrs. Nugent in the back until she was dead. Appellant explained his feelings
and reasoning to the jury, attempting to present evidence of sudden passion. In closing arguments,
the State reminded the jury that the murder was premeditated and stated there was no evidence of
sudden passion or adequate cause. Defense counsel, in his closing argument, referred to defense
testimony in support of a finding of sudden passion. Further, the jury charge included an instruction
on sudden passion. However, a significant amount of evidence before the jury indicated not just the
absence of sudden passion but the presence of premeditation and, more importantly, as explained
above, Dr. Mears' excluded testimony would not have supported a finding of sudden passion. 
Therefore, the error of excluding Dr. Mears' testimony on the issue of sudden passion either did not
influence the jury's verdict or only had a slight effect. See Solomon, 49 S.W.3d at 365. 

 Appellant attempted to mitigate the image presented by the State by explaining that his
outward demeanor was a symptom of a dissociative reaction to severe emotional stress. Before the
jury, Dr. Mears stated that dissociation often grows out of excessive stress and that people who are
dissociative engage in a high level of repression and can have two different kinds of behavior. He
noted that funeral directors are among those who learn to use a repressive technique. Further, Dr.
Edward Gripon, the State's expert witness, thoroughly explained, on cross-examination by defense
counsel, what dissociative disorder is. The jury also heard Appellant testify that he had not thought
about the murder and had put it out of his mind.

 The excluded evidence was very similar. Dr. Mears stated on voir dire that Appellant did not
suffer from dissociative identity disorder but might have had an episodic dissociative event. In the
bill of exception, Dr. Mears indicated that Appellant's flat and deadpan manner after arrest was
indicative of dissociative disorder. He also explained that individuals under a high degree of stress
engage in dissociative episodes. In light of the evidence before the jury, we conclude that exclusion
of Dr. Mears' testimony on the issue of dissociation did not influence the jury's verdict or had only
a slight effect. See id.

 The jury had before it evidence of Appellant's character, his relationship with Mrs. Nugent, 
and the circumstances leading up to the murder. In closing, the State insinuated that, if not in prison,
Appellant would pose a threat to other vulnerable widows. To the extent the State emphasized future
dangerousness, it specified the group that might be in danger. The excluded testimony did not
implicate vulnerable widows as Dr. Mears, in his excluded testimony, referred only to those
individuals within the prison system. Accordingly, exclusion of Dr. Mears' testimony on the issue
of future dangerousness did not influence the jury's verdict or had only a slight effect. See id. 
Therefore, the trial court's erroneous exclusion of evidence did not affect substantial rights and was
harmless error. We overrule Appellant's sixth and seventh issues. 


Conclusion

 After reviewing the original proffer, the trial court's ruling, the evidence before the jury, and
the proffered testimony in the bill of exception as directed by the court of criminal appeals, we
determine that the trial court's erroneous exclusion of evidence was non-constitutional error. It is
therefore subject to a harm analysis pursuant to rule 44.2(b). Because the trial court's erroneous
exclusion of testimony did not affect Appellant's substantial rights, the error was harmless.

 Accordingly, we affirm the trial court's judgment.

 SAM GRIFFITH 

 Justice

Opinion delivered November 20, 2002.

Panel consisted of Gohmert, Jr., C.J., Worthen, J., and Griffith, J.


(DO NOT PUBLISH)