NO. 07-02-0501-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



JANUARY 13, 2003



______________________________




RONALD WAYNE PRICE, APPELLANT



V.



THE STATE OF TEXAS, APPELLEE




_________________________________



FROM THE 110TH DISTRICT COURT OF MOTLEY COUNTY;



NO. 2058; HONORABLE JOHN R. HOLLUMS, JUDGE



_______________________________



Before QUINN and REAVIS, JJ., and BOYD, S.J. (1)

 In this appeal, appellant Ronald Wayne Price challenges his conviction of murder
and the ensuing punishment of 30 years confinement in the Institutional Division of the
Department of Criminal Justice. In pursuing the appeal, he contends: 1) the evidence is
factually insufficient to support the jury's verdict that he did not act in self-defense, and 2) 
the trial court erred in denying his request for the appointment of an expert on confessions,
thereby depriving him of a) due process of law, b) constitutionally required effective
assistance of counsel, c) constitutionally required equal protection rights, and d) the
benefits of the mandates of article 26.05 of the Texas Code of Criminal Procedure. 
Disagreeing that reversal is required, we affirm the judgment of the trial court.

Facts

 The questions presented by this appeal require a somewhat detailed recitation of
the relevant evidence. On March 13, 2002, at about 9:05 p.m., Motley County Sheriff Jim
Meador (Meador) received a call at his residence about a stabbing that had occurred at
Sarah Ho-Gland's (Sarah's) residence in Roaring Springs. Meador proceeded to that
house accompanied by Deputy Ricky Lawrence (Lawrence). Upon their arrival, they found
a man later identified as Alvin "Al" Pettitt (Pettitt), lying unconscious on the floor of the
house. Appellant was also present at the scene bleeding from some knife cuts.

 Meador testified that appellant appeared to have been in some sort of an altercation
and was cut and bleeding. He said the scene around the house was "chaotic" when he
arrived with people inside and outside of the residence screaming and highly agitated. 
Although he averred that he did not consider appellant under arrest, Meador handcuffed
appellant and read him his Miranda rights. In the process of securing the scene and to
ensure the safety of EMS personnel who were en route to the house, Meador removed a
knife he found on an end table in the living room and placed it in his vehicle. After the
deceased's body was removed from the scene, Meador replaced the knife on the end table
and raised the foot rest on the chair adjacent to the end table. He told Lawrence to take
appellant to the sheriff's office and he did not have any other contact with appellant that
day. It is uncontroverted that the victim, Pettitt, died as a result of stab wounds inflicted
upon him by appellant.

 As he was being transported to the sheriff's office, appellant told Lawrence that
Pettitt was the aggressor and that he was forced to stab Pettitt in self defense. 
Subsequently, Jay Foster (Foster), a Texas Ranger, arrived and, after again giving
appellant his Miranda warnings, took a recorded interview from appellant. In the course
of that interview, appellant said that he and his son, Josh Price, went over to Sarah's house
to return some FFA ribbons to Sarah's son, William (William). He said that Sarah was his
ex-wife and he still had some of her "stuff" in his house. As he and his son approached the
front door, he saw Pettitt sitting in a chair just inside the front door. He averred that he
knew from past experience that Pettitt was unpredictable and he did not want his son
around him. Appellant asked Pettitt where Sarah was, and Pettitt replied that she was
across the street at her parent's house. Appellant said he then told his son to go to Sarah
while he, appellant, went into the house where Pettitt was located.

 Appellant averred that he had started to put the ribbons on the kitchen table when
Pettitt told him to put them on the living room table where Pettitt was located. He said he
began talking to Pettitt and Pettitt accused him of trying to get Sarah back. Pettitt jumped
out of his chair, appellant continued, and swung at him. As appellant tried to move out of
the way, he noticed that Pettitt had cut him on his face. He asserted that Pettitt told him
that he was going to kill him and he believed his life was in danger. He said everything
happened rapidly and the pair struggled by the front door and by the chair in which Pettitt
had been seated. Appellant stated he tried to get Pettitt's knife away from him but was
unable to do so and, after Pettitt had stabbed him again on the shoulder, he drew his knife
and stabbed Pettitt.

 In the interview, appellant admitted that he knew from past experience that Pettitt
was a violent and unpredictable man and anything could happen around him. Albeit with
an explanation that he worked at his aunt's restaurant and cut up different food items,
appellant admitted he habitually carried more than one knife. He denied that he went over
to Pettitt's house looking for a fight and felt that if he had not pulled his knife, he "would
have died there."

 After interviewing other witnesses at the scene, including Sarah and her son
William, Foster asked appellant additional questions. In the course of that interrogation,
appellant admitted he had gone over to Sarah's house recently and had shown Pettitt a
gun. He denied that he threatened Pettitt with the gun, but averred that he simply handed
it to Pettitt, who handed it back. He denied telling Sarah that he was going to shoot Pettitt
or that he and Pettitt had been involved in a knife throwing contest the previous Saturday. 
When asked why he locked the door to the house in which the stabbing took place,
appellant replied that he closed the door because he did not want Sarah to see Pettitt "that
way." He also averred that he had no recollection of locking the door after the stabbing.

 Foster testified that he thought it was strange that appellant left his son outside
when appellant knew of Pettitt's propensity toward violence. He also said he would have
expected appellant to have more defensive wounds if he had been engaged in a knife fight
with a bigger and stronger man.

 Sarah testified that she and appellant had been married for about five years prior
to their divorce in September 2000. Pettitt had been living with her for about a month. She
said that although Pettitt was a drinker and could become violent when drunk, he had
recently stopped drinking at her request. On March 13, 2002, the date in question, Pettitt
left early accompanied by his boss, Ross Graham. He returned that evening and sat in his
recliner with a glass of tea. Sarah left her house about 9:00 p.m. to visit her parents, who
lived across the street. While she was there, Josh Price showed up and the pair started
back to Sarah's house. As they did so, they met William and his girlfriend, Jamie Balk, and
the group continued toward Sarah's house. As they approached the house, appellant
closed and locked the front door and Sarah heard a thump on the floor.

 Sarah also testified appellant had called her the day before the occurrence and said
he wanted to shoot Pettitt but he did not know why. The night before the incident, she
said, appellant came over to her house and showed Pettitt a gun which Pettitt looked at
and returned to appellant. She also said that at that time, the two shook hands and agreed
to be friends.

 William testified that on March 13, Pettitt had returned home from work tired, sat
down with a glass of iced tea, and was watching television. William left to pick up his
girlfriend and when they returned, appellant and Pettitt were sitting down. Pettitt was
watching television and appellant was talking to him. William and his girlfriend went over
to Sarah's parent's house to get Josh. The pair met Sarah and Josh and they returned to
Sarah's house. As they got to the front door, "it shut and locked." He heard someone
saying "Al, don't. Al, stop." William and Jamie went to the back door and as they entered,
they saw Pettitt lying on the floor bleeding. William also testified that appellant was at a
party at Sarah's house about a week or so before the stabbing incident, and Pettitt and
appellant threatened to go outside and throw knives at each other.

 Meador testified that about 1:30 a.m. on March 15, 2002, appellant called his
residence and wanted the sheriff to meet with him at an Alsup's store in Matador. When
the sheriff arrived at the store, appellant told the sheriff he wanted to talk. The sheriff
again recited Miranda rights to appellant. Appellant then told Meador that he had "killed
Al." He said he had gone over to Sarah's house to deliver the ribbons. When he arrived,
Pettitt was there, seated in a recliner chair, and told appellant to place the ribbons on a
table adjacent to the chair. Appellant then took out his knife and showed it to Pettitt. Pettitt
handed the knife back to him and he stabbed Pettitt. He then took Pettitt's knife and cut
himself. Appellant did not mention to Meador any aggression on the part of Pettitt that
might have provoked his attack.

 Meador then called Foster, who took a written statement from appellant that was
received into evidence. The written statement was much the same as appellant's oral
statement to the sheriff.


Factual Sufficiency

 In the recent case of Zuliani v. State, 97 S.W.3d 589 (Tex. Crim. App. 2003), the
court had occasion to explicate the standard by which we review the factual sufficiency of
the jury's rejection of a self-defense assertion. In explication of that standard, the court
explained:

 . . . the reviewing court reviews all the evidence in a neutral light and asks
whether the State's evidence taken alone is too weak to support the finding
and whether the proof of guilt, although adequate if taken alone, is against
the great weight and preponderance of the evidence. 

 

Id. at 595.

 In the light of that instruction, we have carefully examined all the evidence in this
case and have concluded that it is sufficient to sustain the jury's verdict. This is particularly
true in view of appellant's various inconsistent and incriminating statements, and all of the
surrounding circumstances and testimony we have listed above. Accordingly, appellant's
first issue must be, and is hereby, overruled.

 As we have noted, in his remaining four issues, appellant contends that the refusal
of the trial court to appoint him an expert on confessions deprived him of various
constitutional and statutory rights, as well as the effective assistance of counsel. In
reviewing that denial, we must determine if the trial court abused its discretion in refusing
appellant's request. Griffith v. State, 983 S.W.2d 282, 287 (Tex. Crim. App. 1998), cert.
denied, 528 U.S. 826, 120 S.Ct. 77, 145 L.Ed.2d 65 (1999). 

 The seminal case in the area of the necessity for appointment of experts for an
indigent defendant is Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct.1087, 84 L.Ed.2d 53 (1985). 
In Ake, the defendant sought the appointment of a psychiatrist to assist on the issue of the
defendant's sanity at the time of the offense. In considering the defendant's request, the
Ake Court explained that due process requires access to raw materials integral to the
building of an effective defense. Even so, it went on to say that a state need not "purchase
for the indigent defendant all the assistance that his wealthier counterpart might buy," but
rather must provide him the basic tools to present his defense within our adversary system.
Id. 470 U.S. 77, 105 S.Ct. 1093. To decide whether the appointment of a particular expert
is a "basic tool" within the purview of the Ake instruction in a given case, a reviewing court
must consider three factors. Id.; Norton v. State, 930 S.W.2d 101, 105 (Tex. App.-Amarillo
1996, pet. ref'd). Those factors are: 1) the private interest that would be affected by the
action of the State; 2) the governmental interest that will be affected if the safeguard is to
be provided; and 3) the probable value of the additional or substitute procedural
safeguards that are sought and the risk of an erroneous deprivation of the affected interest
if those safeguards are not provided. Ake, 470 U.S. at 77, 105 S.Ct. 1093; Norton, 930
S.W.2d at 105. Moreover, the reviewing court must bear in mind that the government is
only required to provide indigent defendants with expert assistance in cases in which the
defendant has made a sufficient threshold showing. To be sufficient, that threshold
showing must establish that not only does there exist a reasonable probability that an
expert would be of assistance, but also that the denial of the requested expert assistance
would result in a fundamentally unfair trial. Norton, 930 S.W.2d at 106-07.

 In this case, the defense was given money for both a crime scene expert and a
psychiatrist. The psychiatrist was called to testify for appellant. In his written motion,
appellant claimed he needed the confession expert because of appellant's background,
his health disorders, and mental illness. However, he did not support these allegations by
pertinent evidence. 

 This record does not show that the trial court's refusal to appoint the requested
confession specialist resulted in a fundamentally unfair trial. This is particularly true in view
of the trial court's appointment of a psychiatrist and a crime scene expert. Thus, the trial
court did not abuse its discretion in refusing to appoint a confession expert. That being so,
its refusal to do so did not deprive appellant of any of his constitutional or statutory rights,
nor did it deprive him of the effective assistance of counsel. Appellant's second through
fifth issues are overruled.

 In summary, all of appellant's issues are overruled and the judgment of the trial
court is affirmed.


 John T. Boyd

 Senior Justice


Do not publish.
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. 
Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2004). 



nUsed="false" Name="Medium List 2 Accent 6"/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 









NO. 07-11-0309-CR

 

IN THE COURT OF APPEALS

 

FOR THE SEVENTH DISTRICT OF TEXAS

 

AT AMARILLO

 

PANEL C

 

AUGUST 26, 2011

 

______________________________

 

 

JOHANSON LEE WATSON, APPELLANT

 

V.

 

THE STATE OF TEXAS, APPELLEE

 

 

_________________________________

 

FROM THE 46TH DISTRICT COURT OF WILBARGER
COUNTY;

 

NO. 9480; HONORABLE DAN MIKE BIRD, JUDGE[1]

 

_______________________________

 

Before QUINN, C.J., and HANCOCK and PIRTLE, JJ.

MEMORANDUM OPINION

            On August 23,
2011, this Court sua sponte transferred
to this cause number the record from two previous mandamus proceedings[2]
brought by Appellant, Johanson Lee Watson. 
According to the limited record before this Court, on February 8, 1997, Appellant
was indicted in trial court cause number 9479 for the offense of sexual assault
of a child.  That same date, he was also
indicted in trial court cause number 9480 for the offense burglary of a
habitation.  Pursuant to a plea bargain
agreement with the State, Appellant agreed to plead guilty to the sexual
assault offense in exchange for the dismissal of the burglary of a habitation
case.  A judgment of conviction was
entered in cause number 9479 on August 8, 1997. 
The indictment in cause number 9480 was subsequently dismissed.  

On January 18, 2011, Relator filed a Motion for Leave for Judgment Nunc Pro Tunc
in both trial court cause numbers, arguing that the oral pronouncement at the
sentencing hearing in 1997 conflicted with the trial court's written judgment
in cause number 9479.  In April 2011, proceeding pro se and in forma pauperis, Appellant filed a mandamus proceeding in
this Court in cause number 07-11-0177-CV, seeking to compel the trial court to
rule on that motion.  This Court
requested a response from the trial court. 
In lieu of a response, on June 10, 2011, the trial court conducted a
hearing on Appellant's motion.  Following
that hearing, the trial court denied the request for a judgment nunc pro tunc and entered a written
order memorializing that ruling.  Appellant's
court-appointed counsel filed a notice of appeal from that ruling, bearing
cause number 9480, which notice gave rise to the instant appeal.[3]

A notice of appeal reflecting a
cause number for which there is no sentence or final judgment of conviction
does not invoke our jurisdiction.  See Ex parte Rathmell,
717 S.W.2d 33, 48 (Tex.Crim.App. 1986).  See also De Silva v. State, 98 Tex.Crim. 499, 267 S.W.271, 272 (1924) (noting that appeals
are normally limited to a person convicted of offenses and those denied release
under writ of habeas corpus).

No conviction having ever been
entered in the cause number 9480, there is no final
judgment from which an appeal may be prosecuted.  Consequently, this purported appeal is
dismissed for want of jurisdiction.

 

 

                                                                                    Patrick A. Pirtle

                                                                                          Justice

 

Do not publish.

 

 











[1]Hon. Stuart Messer, sitting by assignment.  Tex. Gov't Code Ann. § 75.002(a)(3) (West 2005).

 





[2]See In re Watson, No. 07-11-00157-CV,
2011 Tex. App. LEXIS 6493 (Tex.App.--Amarillo Aug. 15, 2011, orig. proceeding),
and In re Watson, No. 07-11-0177-CV. 2011 Tex. App. LEXIS
6482 (Tex.App.--Amarillo Aug. 15, 2011).





[3]Appellant's
appointed counsel also filed a notice of appeal from that ruling, bearing cause
number 9479, which notice gave rise to the appeal in cause number
07-11-0308-CR.